[No. 40550. En Banc. August 28, 1969.]

GLENNIE O'CONNOR, *Petitioner*, v. CHARLES MATZDORFF *et al.*, *Respondents.**

*Reported in 458 P.2d 154.

590

*Charles E. Ehlert,* for petitioner.

*Lincoln E. Shropshire, Jon R. Harlan,* and *Campbell Hopkins,* for respondents.

*John Gant,* amicus curiae.

ROSELLINI, J.—On August 19, 1968, Glennie O'Connor, through her attorney, tendered a complaint for replevin and damages in the total amount of $215.50 to the Honorable George H. Mullins, Judge of the Yakima Justice Court, and to his clerk, for filing. She did not tender any money for fees, and instead tendered her motion and affidavit for leave to proceed in forma pauperis. Judge Mullins and his clerk refused to accept the complaint and to issue a notice of suit to the named defendants on the sole ground that she had not paid the filing fee of $3.50.

In refusing to accept the complaint or issue notice of suit without payment of fees, the respondents relied upon RCW 3.16.070 and 27.24.070 (1). They provide:

3.16.070 Fees of nonsalaried justices. The fees and compensation of justices of the peace shall be as follows, to wit:

When each case is filed the sum of two dollars shall be paid by the plaintiff, which said sum shall include the docketing of the cause, the issuing of notice and summons, the trial of the case and the entering of judgment:

. . .

27.24.070 Additional filing fees. In each county pursuant to this chapter, the clerk of the superior court shall pay from each fee collected for the filing in his office of every new probate or civil matter, including appeals, abstracts or transcripts of judgments, the sum of three dollars for the support of the law library in that county, which shall be paid to the county treasurer to be credited to the county law library fund. There shall be paid to each justice of the peace in every civil action commenced in such court where the demand or value of the property in controversy is one hundred dollars or more, in addition to the other fees required by law the sum of one dollar and fifty cents as fees for the support of the law library in that county which are to be taxed as part of costs in each case:

(1) By each person instituting an action, when the first paper is filed;

(2) By each defendant, other adverse party, or intervenor, appearing separately when his appearance is entered on his first paper filed.

The justice of the peace shall pay such fees so collected to [the] county treasurer to be credited to the county law library fund.

Her application for leave to proceed in forma pauperis having been refused, Glennie O'Connor petitioned this court for a writ of mandamus ordering the respondents to accept and file her complaint and to issue notice of suit thereon, without the payment of any filing fee.

 The first question presented is whether the petitioner has pursued the proper remedy. While the ordinary procedure is to petition the superior court for review of an inferior court's decision, rather than the supreme court, this court does not lack jurisdiction to entertain an application for an extraordinary writ directed to a court of limited

jurisdiction. In *Seattle v. Rohrer,* 69 Wn.2d 852, 420 P.2d 687 (1966), we held that this court has original jurisdiction to issue a writ of prohibition to a municipal court, under the authority of Const. art. 4, § 4, providing in part that the supreme court shall have power to issue writs of prohibition which are necessary and proper to the complete exercise of its appellate jurisdiction.

■ This constitutional provision also authorizes the issuance of writs of mandamus for such purpose. We said in *Seattle v. Rohrer, supra,* that the power is properly exercised when a fundamental issue involving the rights of the petitioner is presented. As the petitioner here maintains, the question whether she is entitled to pursue her remedy at law for an alleged wrong, in spite of her poverty, raises a fundamental issue and one which must be decided by this court ultimately, whatever the answer of the superior court might be.

We have said that we will assume original jurisdiction when the application involves the "interests of the state at large, or of the public, or when it is necessary to afford an adequate remedy." *State ex rel. Pacific Bridge Co. v. Washington Toll Bridge Authority,* 8 Wn.2d 337, 112 P.2d 135 (1941). Although only an individual's right is being asserted in this proceeding, the question to be decided involves very deeply the interests of the public and in particular those of a regrettably large segment of our society. The right of the poor to obtain redress for wrongs, and to defend themselves when sued by the more affluent, is presently of nationwide concern, as is evidenced by the attention given to the subject in legal periodicals. Some notable discussions are to be found in the following: Samore, *Legal Services for the Poor,* 32 Albany L. Rev. 509 (Spring 1968); Shriver, *Law Reform and the Poor,* 17 Am. U.L. Rev. 1 (Dec. 1967); Stumpf, *Law and Poverty: A Political Perspective,* 3 Wis. L. Rev. 694 (1968); Silverstein, *Waiver of Court Costs and Appointment of Counsel for Poor Persons in Civil Cases,* 2 Valparaiso U.L. Rev. 21 (Fall 1967); Barvick, *Legal Services and the Rural Poor,* 15 Kan. L. Rev. 537 (1967).

The leading article was written years ago by John Mac-Arthur Maguire, *Poverty and Civil Litigation,* 36. Harv. L. Rev. 361 (Feb. 1923), reviewing the history of the relations between poor people and the courts and lamenting the slowness of the movement toward justice for the indigent. *See also* a book by J. Comer, Forging the Federal Indigent Code (1966).

We are convinced that the question presented in this case is of such significant public import and urgency that we are justified in assuming original jurisdiction.

The petitioner has requested permission of the court to proceed here in forma pauperis. The record shows that Glennie O'Connor is a woman with five children. She is not employed. The sole source of support for her and her children is a monthly grant received from the Department of Public Assistance in the amount of $325, computed by the department to provide her and her children with slightly less than they need for basic subsistence. The grant is calculated according to a set of minimum values for the basic needs for the family compatible with minimum standards of decency.

No provision is made in Mrs. O'Connor's public assistance grant for any money for filing fees or expenses of civil litigation. This is conceded by the respondent.[1]

It might seem at first blush that an annual income of $3,900 is adequate to provide the necessities of life and allow $3.50 for a justice court filing fee. However, the Social Security Administration has defined as poverty stricken in the year 1968 a family of four having an income of less than $3,335 per year. According to this definition, assuming the needs of each member of the family are equal, the subsistence needs of an individual require an income of at least $800, and the minimum requirements of a family of six would be $4,800. The Seattle Post-Intelligencer, in an editorial appearing April 18, 1969, reported that, while a family income of $3,000 is considered the poverty level

---

[1] The Department of Public Assistance apparently has no funds which can be made available to the poor for the payment of court costs. *See* Silverstein, 2 Valparaiso U. L. Rev., *supra,* note 100, at 40.

nationally, it is estimated at $4,000 in Seattle, or 33⅓ per cent higher than the national level. The editorial does not mention the size of the family to which it refers, but since the Social Security Administration's figure, which is slightly higher than $3,000, applies to a family of four, presumably it is a family of four of which the editorial speaks.

It is generally conceded that a family on relief is indigent. *See* Samore, 32 Albany L. Rev., *supra* at 512.

■ This court has recently had occasion to discuss the concept of indigence in a case involving the right of a defendant in a criminal case to obtain a prepaid statement of facts and transcript in a nonfrivolous appeal. We held that the term does not and cannot, in keeping with the concept of equal justice to every man, mean absolute destitution or total insolvency. Rather it connotes a state of impoverishment or lack of resources on the part of the defendant which, when realistically viewed in the light of everyday practicalities, substantially and effectively impairs or prevents his pursuit of his remedy. *State v. Rutherford,* 63 Wn.2d 949, 389 P.2d 895 (1964).

The petitioner there was conditionally denied the right to obtain a free statement of facts and transcript, the court being of the opinion that, because of his assets (though heavily encumbered), his reputation as a businessman and his credit rating, he could possibly borrow the necessary funds, giving reasonable assurance that he would be able to repay the loan. He was given leave, however, to renew his application, if he was unable to obtain such a loan, this court recognizing that, unless his credit was sufficient to enable him to obtain a loan, he was, for all practical purposes, as far as paying the large cost of a statement of facts was concerned, indigent.

We think it is plain, and it is not disputed by the respondents, that the assets of the petitioner are insufficient to permit her to pay the costs of pursuing her remedy in this court without depriving her children of a portion of

their basic needs.[2] The request for permission to proceed here in forma pauperis should therefore be granted if this court has the power to grant such permission.

The respondents point out that our Rule on Appeal 10, RCW vol. 0, directs the clerk not to file any paper on the part of any party to a proceeding until the statutory docket fees, chargeable against such party, have been paid, except in the case of indigent criminal appeals. They point out that the statutes authorize appeals in forma pauperis only in criminal cases. They also cite *State v. Currie*, 200 Wash. 699, 94 P.2d 754 (1939), in which this court held that its rules prescribing the time in which documents should be filed in an appellate proceeding could not be waived.

In that case, this court noted that the rule in question had been adopted after lengthy and thorough consideration of the need for expediting appeals in criminal cases, and that the rule had been promulgated at the direct command of the legislature to "promote the speedy determination of litigation." It had, this court said, as a result, the force and effect of a statute, and the court was powerless to engraft exceptions or excuse its violations.

■■ We did not say in that case that all of our rules have the force and effect of statutes which must be inexorably applied. And, in fact, we have since suspended the rules where justice demanded it. In *State v. Brown*, 26 Wn.2d 857, 865, 176 P.2d 293 (1947), (noted in 55 A.L.R. 2d 1114), a capital case, we said:

> The purpose of the rules of practice and procedure adopted by this court is to simplify and facilitate the

[2]In *Adkins v. E. I. DuPont de Nemours & Co.*, 335 U.S. 331, 339, 93 L. Ed. 43, 69 S. Ct. 85 (1948), the United States Supreme Court said:
We cannot agree with the court below that one must be absolutely destitute to enjoy the benefit of the statute. We think an affidavit is sufficient which states that one cannot because of this poverty "pay or give security for the costs . . . and still be able to provide" himself and dependents "with the necessities of life." To say that no persons are entitled to the statute's benefits until they have sworn to contribute to payment of costs, the last dollar they have or can get, and thus make themselves and their dependents wholly destitute, would be to construe the statute in a way that would throw its beneficiaries into the category of public charges.

practice and, wherever possible, to eliminate delay in reaching a final determination of litigation, civil or criminal, on the merits. No rule of this court was ever intended to be an instrument of oppression or injustice or to deprive a litigant of his life, his liberty, or his property without due process of law.

We made it clear in that case, however, that only in extreme cases would the court exercise its rule-making power to suspend the operation of its existing rule to permit a party to have his day in court.

Again, in *State ex rel. Bird v. Superior Court,* 30 Wn.2d 110, 190 P.2d 762 (1948), we held that a "jurisdictional" procedural requirement, that of timely filing of the notice of appeal, could be waived by the court where the defendant in a capital case was deprived of his right of appeal because of circumstances for which various public officials were responsible.

While this court again asserted that the timely filing of a statement of facts is jurisdictional in *Hamilton v. Kiona-Benton Irr. Dist.,* 44 Wn.2d 421, 268 P.2d 446 (1954), we have since rejected the concept that the timely filing of a statement of facts is jurisdictional and recognized that it is only a step in the proceedings, resting upon the jurisdiction originally acquired by the court in the cause. ROA 34. And in ROA 32, we have said that the only jurisdictional requirement is the timely filing of notice of appeal (note that, according to *State ex rel. Bird v. Superior Court, supra,* even that rule can be suspended), and that failure to take other steps may render the appeal dismissable if no other remedy is provided in the rules, in the discretion of this court.

In these new rules of court we have recognized the validity of the dissents of Judge Herman in *Potlatch Lumber Co. v. Ferry County,* 167 Wash. 491, 9 P.2d 783 (1932), and Judge Grady in *Hamilton v. Kiona-Benton Irr. Dist., supra,* both of whom earnestly contended that the power to make rules carries with it the power to waive them or to except a particular case from their operation whenever the purpose of justice so requires. They cited *United States v. Breitling,*

61 U.S. (20 How.) 252 (1857), wherein the United States Supreme Court declared this to be the correct rule.

We hold therefore that we have the inherent power to waive the requirements of our rules. The question remains whether we also have the power to waive prepayment of a filing fee, when the fee is prescribed by statute. The applicable statute here is RCW 2.32.070. This statute provides that the clerk of the court shall collect certain fees which are provided therein. Certain exceptions are made. It might be suggested that, by expressing certain exceptions, the legislature expressed an intent that no other exceptions should be allowed. However, if such an interpretation would result in depriving the court of one of its inherent powers, and the petitioner of one of his valuable rights as a member of a free society ruled by law, it is manifest that this court should not indulge in a presumption that this was the legislative intent.

The question then arises, has the court the inherent power to waive fees prescribed by statute.

It is significant that in *State v. Brown, supra,* this court had no trouble in recognizing the right of the defendants to appeal in forma pauperis, at least insofar as the payment of court fees was concerned, even though the dissent pointed out that no statute authorized such an appeal, and even though this court had previously held that the defendant in a criminal case had no right to obtain a free transcript on appeal. This was the holding of *State ex rel. Mahoney v. Ronald,* 117 Wash. 641, 202 P. 241 (1921), *State ex rel. Langhorne v. Superior Court,* 32 Wash. 80, 72 P. 1027 (1903), and *Stowe v. State,* 2 Wash. 124, 25 P. 1085 (1891). *See also Bokien v. State,* 14 Wash. 401, 44 P. 883 (1896).

A contrary decision was reached in *State ex rel. Coella v. Fenimore,* 2 Wash. 370, 26 P. 807 (1891), wherein this court held that a defendant in a criminal case could obtain a free transcript of the record. While this case was criticized in subsequent Washington cases, it has now been demonstrated to be in accord with the requirements of the federal and state constitutions, which guarantee the rights of criminal defendants. We are confident that no citation of

authority is necessary to support this conclusion, the United States Supreme Court decisions regarding these rights having entered the domain of common knowledge.

In *State ex rel. Mahoney v. Ronald, supra,* while holding that there is no right of appeal in forma pauperis in criminal cases, this court impliedly recognized that the right existed at common law in civil cases, when it said, at 644:

> At common law there was no right of appeal in criminal cases, and the English statute providing for suits by poor people without the payment of fees did not apply to criminal appeals.

That such a right did exist at common law is acknowledged by students of that law. Their findings are well expressed in the following discussion taken from an annotation, Financial circumstances which will enable one to sue in forma pauperis.

6 A.L.R. 1281 (1920) states:

> There seems to be no doubt that some indulgence to poor persons in bringing their actions existed from a very early period.
>
> It is said in Britton, bk. 1, chap. 14, Views on Disseisin, p. 117B, that "it is the sheriff's duty to take pledges, two at least, distrainable to himself, that the plaintiff will prosecute his plaint, except where, on account of his poverty, we have permitted him to sue his plaint upon the pledge of his promise only; and then he shall find no other security to the sheriff."
>
> It is stated in the Mirrour of Justices, chap. 1, § 3, that "it was ordained that no action was receivable to judgment, if there was not a present proof by witnesses or other things; and that none was bound to answer to any suit, nor to appear to any action in the King's courts before the King's justices, before they found sureties to answer damages and the costs of suit, if damages lay in the case, except in four offenses,—Disseisins, certification of disseisins, attaints, redisseisins, and other cases. To which ordinance King Henry the First put this mitigation in favor of poor plaintiffs, that those who had not sufficient sureties present should make satisfaction according to their ability, according to a reasonable taxation."
>
> In Brunt v. Wardle (1841) 3 Mann. & G. 534, 133 Eng. Reprint, 1254, Tindal, Ch. J., said: "But, after all, is the

11 Hen. VII. chap. 12, anything more than confirmatory of the common law? In the learned report of the Serjeants's case by my brother Manning, p. 41, note (d), a case is referred to that occurred in the 15 Edw. IV., twenty years before the passing of that act, from which it appears that at common law if a party would swear that he could not pay for entering his pleadings, the officer was bound to enter them gratis; and that in this court there was a presignator pur les poers." Maule, J., in the same case took a similar view.

So at an earlier stage of the reported case (Majors v. Superior Ct. ante, 1274) reported sub nom. Martin v. Superior Ct. (1917) 176 Cal. 289, L.R.A. 1918B, 313, 168 Pac. 135, it was held that the power of the courts to remit fees in forma pauperis was inherent at common law.

But some of the authorities have taken the view that the right to sue in forma pauperis originated in statute. Thus, in Oldfield v. Cobbett (1845) 1 Phill. Ch. 613, 41 Eng. Reprint, 765, Lyndhurst, Ld. Ch., said that "the right to sue in forma pauperis originated in the statute of Hen. VII." So it is stated that the right originated in statute in Roy v. Louisville, N. O. & T. R. Co. (1888) 34 Fed. 276; Bristol v. United States (1904) 63 C. C. A. 529, 129 Fed. 87; Hoey v. McCarthy (1890) 124 Ind. 464, 24 N. E. 1038; Harrison v. Stanton (1896) 146 Ind. 366, 45 N. E. 582. The last of these cases cites the authority of Tidd's Practice, but Tidd makes no such statement. On the other hand in Ferguson v. Dent (1883) 15 Fed. 771, the court apparently gives Tidd as authority for the statement that the common law allowed poor persons to sue in forma pauperis.

In Campbell v. Chicago & N. W. R. Co. (1868) 23 Wis. 490, the court affirmed a dismissal of an action because the plaintiff, through inability, failed to give security for costs, stating that there was no statute authorizing a person to sue in forma pauperis, and that the matter was one for the legislature.

By the statute 11 Hen. VII. chap. 12, it was provided "that every poor Person or Persons, which have, or hereafter shall have Cause of Action or Actions against any Person or Persons within this Realm, shall have by the Discretion of the Chancellor of this Realm for the time being, Writ or Writs Original, and Writs of Subpoena, according to the Nature of their Causes, therefore nothing paying to your Highness for the Seals of the same,

nor to any Person for the writing of the same Writ and Writs to be hereafter sued;" etc., etc.

The statute 23 Hen. VIII. chap. 15, as to costs in case of nonsuits or verdicts against the plaintiffs, provided that all and every such poor person or persons admitted by discretion of the judges to have their process and counsel of charity, without any money or fee paying for the same, shall not be compelled to pay any costs by virtue and force of this statute, but shall suffer other punishment as by the discretion of the judge shall be thought reasonable.

We think the authorities cited in the annotation sufficiently establish that courts have found within their powers an inherent power to waive the prepayment of court fees, where a suitor or defendant has shown that he is impoverished, regardless of statutory authority. We are also convinced that such a power is in harmony with the court's duty to see that justice is done in the cases which come before it, which fall within its jurisdiction. *In re Bruen,* 102 Wash. 472, 476, 172 P. 1152 (1918), states:

The inherent power of the court is the power to protect itself; the power to administer justice whether any previous form of remedy had been granted or not; the power to promulgate rules for its practice, and the power to provide process where none exists. It is true that the judicial power of this court was created by the constitution, but upon coming into being under the constitution, this court came into being with inherent powers.

The respondent contends that RCW 2.32.080 impliedly forbids the supreme court to waive filing fees for extraordinary writs. That statute, by its terms, applies only to criminal actions and we need not pass upon its validity.

The question remains whether the court should exercise the power to waive its fees in a given case. Frivolous appeals or petitions should not be encouraged, since the defendant has little hope of recovering his costs from the indigent plaintiff if he defeats the action.

As the annotation reveals, it was the custom, or at least was said to be the custom, to punish a poor man whose suit was unsuccessful. That was not found to be a very satisfac-

tory method of discouraging frivolous litigation for the obvious reason that it was too harsh; and it is now generally thought that it is sufficient to require an affidavit that the suit is brought in good faith, or if possible an attorney's affidavit that it has apparent merit, if the court has no means of making an independent investigation. Maguire, 36 Harv. L. Rev., *supra*, in his article suggests that a comprehensive legislative program should be enacted, providing among other things for the hiring of investigators to serve the court. *See* page 399 of the article.

The fear has been expressed that, if the poor are allowed to litigate without paying the "deterring" court fees, they will inundate the courts with frivolous cases. This attitude overlooks the fact that the poor are most often ignorant of judicial processes, except insofar as they are the victims of such processes. Not only do they not know what remedies exist for the wrongs done them and not only are they ignorant of the procedures for availing themselves of these remedies, but their attitute toward the courts is one of fear.[3]

---

[3]*See* Barvick, 15 Kan. L. Rev., *supra* at 539. He says, speaking of the poor in general: "[A proposed] program should educate the poor regarding existing laws, provide, through lawyers, representation and counseling where needed, and take steps to remedy injustice where the law and its administration have treated the poor unjustly. As one of the causes of poverty may be the social relationship of the poor to the rest of the community, these relationships should be examined and when necessary, steps should be taken to change them.

"Ignorance and misunderstanding surround the poor's view of the law. To them the law has a magical quality, lawyers are the magicians, and the victims of the lawyer's tricks are the poor. Lawyers are the masters of technicalities, and technicalities stand in the way of fair treatment. They do not see the law as a reasonable means of resolving disputes or adjudicating rights. Instead, they view it as arbitrary, capricious, and unrestrained. The law is a policeman, a magistrate judge, and a welfare administrator, persons with unlimited power, from whose decisions there is no appeal. This is all part of the hopelessness associated with being poor. Because they cannot visualize legal remedies helping them, the poor develop extra-legal remedies: when they buy defective goods, the defense is nonpayment; when their landlords fail to provide heat or repairs, the defense is to sneak off without paying the rent; when the welfare laws seem to deprive them of the help their families need, they lie and develop subterfuges to get around

The experience of the small claims courts should demonstrate how groundless is the fear that the poor will abuse the judicial process. The original purpose of these courts was to help the poor to recover small claims without the aid of counsel. According to Professor Samore, that purpose has failed miserably. Samore, *supra*, citing Kronheim, XX Va. L. Weekly, *Dicta* No. 7 (1967) and Murphy, *Small Claims—The Forgotten Courts?*, 25 Legal Aid Briefcase 167 (1967). These courts are used more to prosecute claims against the poor than claims by them.

Speaking of the invalidity of the hypothesis that fees serve a useful purpose in discouraging litigation, Lee Silverstein, director of research and publications, National Legal Aid and Defender Association, said in his article *Waiver of Court Costs and Appointment of Counsel for Poor Persons in Civil Cases*, 2 Valparaiso U.L. Rev. at 25-26:

A second practical disadvantage of the proposal [that the court system be completely free to litigants, as are administrative agencies, schools, libraries, parks, etc.] is that merely eliminating court fees and costs would not be enough to make the courts accessible to the poor. Some system is needed to cover the auxiliary expenses of litigation, such as publication fees, bond premiums, fees of investigators and expert witnesses, and, in some jurisdictions, court stenographers. More important, the system must assure that an attorney is provided for the litigant. Further, even if all the financial requisites of litigation are either eliminated or subsidized, many good claims and defenses will go unasserted, especially by the poor. This is because the courts typically hold sessions Monday through Friday between 9 and 5 (or shorter hours) at courthouses in central business districts. The typical workingman or woman must forego at least half a day's pay to make use of the courts, and possibly more, depending on such factors as the type of work he does, how far he must travel, how long he has to wait for his case

---

the regulations. In other words, when the law fails to be fair, they circumvent it. It should be noted, however, that the poor are not the only ones who have resorted to such tactics. The best illustration of the same kind of deceit, subterfuge, and dishonesty on a larger scale was the public reaction to national prohibition."

to be called, whether the case is continued, whether he has to appear once to file the case and another time for trial, etc. The literature of small claims courts has long pointed out the need for night and Saturday sessions, neighborhood branch courts, and simplified procedure. An American Bar Foundation study found that a central Illinois county with a population of 200,000 had only a single court handling small claims and that it held sessions only during the usual 9 to 5 hours Monday through Friday. Not surprisingly, the court was used mainly for unlawful detainer actions, municipal tax claims, and collection of small debts by merchants, hospitals, doctors, and dentists. Most of the claims went by default. The total volume was surprisingly small for a population of 200,000. Finally, even with an ideal court system, the poor probably need education in how and when to make use of it.

(Footnotes omitted.)

The observations of these writers seem sound in general. Nevertheless, we are not prepared to say that, in every action brought or appeal pursued by a poor person, his court fees should be automatically waived. If an action or petition is patently frivolous, or brought for purposes of harassment, the court should not lend its encouragement by waiving its fees. But where a case appears to have been brought in good faith and to have probable merit, the exercise of a sound discretion dictates that a litigant should not be denied his day in court simply because he is financially unable to pay the court fees.

In the matter presently before the court, we need only determine whether the petition is urged in good faith and presents an issue of probable substance, and we are convinced that it does. The motion for leave to proceed in this court in forma pauperis is therefore granted.

Upon the merits the petitioner contends, first, that the justice courts of this state also have inherent power to waive the statutory fees; and, second, that she has a constitutional right to petition the courts for redress of wrongs done her and that this right cannot be taken away by the imposition of fees which she is unable to pay. She also contends that the requirement that she pay the court fees

denies her equal protection of the laws and the guaranty of due process.

■ We need not consider at this time the constitutional arguments presented, inasmuch as we are of the opinion that the court below has the power to waive its fees and grant the petitioner the relief which she seeks. We note in passing, however, that all of the authorities cited in support of the petitioner's contentions regarding her constitutional rights concern the rights of defendants in criminal cases; and that there are certain obvious distinctions between a criminal defendant, whose life, liberty, or property is placed in jeopardy by the state, and a civil plaintiff, whose claim is waged against a fellow citizen. However, we need not and do not decide here that such distinction concludes the question.

Upon the question whether a justice court has the inherent power to waive the statutory fees, neither party to this proceeding has cited authorities directly in point. In the case of *Martin v. Superior Court,* 176 Cal. 289, 168 P. 135 (1917), cited in the A.L.R. annotation, *supra,* the California court observed that the legislature had enacted a law making express provision for the right of a suitor in justice court to prosecute an action in forma pauperis, while no such provision was made applicable to courts of record. The court reasoned that the legislature had enacted the provision relating to justice courts to remove any question of the right to proceed thus in courts not exercising common law jurisdiction, and that the legislature must have been aware that common law courts had the inherent power to permit poor persons to proceed in forma pauperis and must therefore have seen no necessity of expressly recognizing that power.

The justice courts of this state do exercise a portion of the common law jurisdiction. We have heretofore spoken upon this subject. We stated in *State ex rel. Brockway v. Whitehead,* 88 Wash. 549, 551, 153 P. 349 (1915):

The only differences between courts of record and courts not of record are that the record of the one speaks

verity until reversed or set aside on appeal, while the other is subject to inquiry in a collateral proceeding, and a court of record has an inherent power to correct its own records, while a court not of record has only such powers in this respect as are given by statute.

Justice courts are no less courts because they are not courts of record. They exercise, within their jurisdiction, the same judicial functions as do courts of record.

We cited this case with approval in *State ex rel. McFerran v. Justice Court of Evangeline Starr*, 32 Wn.2d 544, 549, 202 P.2d 927 (1949), wherein we said, in discussing powers of a justice of the peace:

We are of the opinion that it is fundamental that every court has certain inherent powers resulting from its organization, which are essential to its existence and *the due administration of justice.*

Holding that a justice of the peace, who was convinced that he could not give the defendant a fair trial, had the right to transfer a cause to another justice on his own motion, we said, at 550:

Again, it seems to us that a justice court, although not a court of record, has certain inherent powers essential to the due administration of justice, and that the due administration of justice requires that these causes be transferred to a justice of the peace where defendant may obtain a fair and speedy trial.

*See also* RCW 2.28.150, which provides:

When jurisdiction is, by the Constitution of this state, or by statute, conferred on a court or judicial officer all the means to carry it into effect are also given; and in the exercise of the jurisdiction, if the course of proceeding is not specifically pointed out by statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of the laws.

Were this court to hold that the Supreme Court has the power to waive prepayment of costs and that the superior court has a like power, but that no such power exists in justice courts, an anachronism would result. This would be tantamount to a holding that, if a poor person has a large

claim, the courts will open their doors to him; but if his claim is small, those doors must be closed, simply because there were no justice courts at common law. Such a ruling could only be greeted with justified bewilderment on the part of the already confused and intimidated poor. We think it safe to surmise that a substantial number of the claims of the poor, if not the majority of them, are cognizable by justice courts rather than by the superior court; and to deny them access to these courts of limited jurisdiction, because of their poverty, would be to deny a large part of the justice which is so sorely needed.

In *State ex. rel. Pacific Coast Adjust Co. v. Taggart,* 159 Wash. 201, 204, 292 P. 741 (1930), this court said:

In this state a justice of the peace court is a constitutional court. It is a court regarded as of great importance to the people at large, as it opens the door of justice near their homes and affords a cheap and speedy remedy for minor grievances as to the rights of property.

The proper and impartial administration of justice requires that these doors be kept open to the poor as well as to those who can afford to pay the statutory fees.

We hold that a justice of the peace has the inherent power to waive prepayment of the justice court fee where justice requires such action. Whether he should do so or not depends, of course, upon the showing of poverty made by the applicant and upon whether his claim appears to be brought in good faith and with probable merit.

As we have concluded earlier in this opinion, the petitioner has made a sufficient showing that she is unable to pay the court fees imposed by law; but we are not prepared to pass upon the question whether the claim she presented in the court below was brought in good faith and is not frivolous. That is a matter to be determined by the justice of the peace.

■ The respondent has pointed out that mandamus will not lie to compel the performance of a discretionary act. However, mandamus will lie to direct an officer to exercise

a discretion, which it is his duty to exercise. *State ex rel. Klappsa v. Enumclaw*, 73 Wn.2d 451, 439 P.2d 246 (1968).

The writ will issue accordingly.

HUNTER, C. J., HILL, FINLEY, HAMILTON, HALE, NEILL, and McGOVERN, JJ., concur.

DONWORTH, J. Pro Tem., concurs in the result.

———

November 5, 1969. Petition for rehearing denied.

