[No. 42817. En Banc. June 5, 1975.]

SIDNEY L. CARTER, *Appellant*, v. THE UNIVERSITY OF WASHINGTON, *Respondent.*

*Sidney L. Carter*, pro se.

*Slade Gorton, Attorney General, James B. Wilson, Senior Assistant,* and *Gerald L. Coe, Assistant,* for respondent.

*Paul M. Geier* and *James. E. Fearn, Jr.,* amici curiae, on behalf of Legal Services Center.

FINLEY, J.—In this cause, the court is asked to grant appellant's motion to allow the filing of his appeal without the payment of costs or appeal bond requisite under ROA I-10 and I-22.

It appears that appellant Carter was a civil service employee of the University of Washington Trucking Service. This employment was terminated because of his alleged violation of state and institutional regulations. Pursuant to RCW 28B.16.120, he sought and was granted review of his termination by the Higher Education Personnel Board. After a hearing, the board upheld the termination by the University of Washington and dismissed the appeal. In accordance with RCW 28B.16.150, appellant sought review of the board's ruling in the King County Superior Court. Following a hearing the Superior Court issued its order affirming the Higher Education Personnel Board. It is this order of the Superior Court which appellant Carter seeks to appeal.[1]

---

[1] The foregoing "facts" were gleaned from the briefs of amicus curiae and respondent, and are assumed to be accurate. Due to appellant's apparent indigency and the posture of this appeal the court has before it no brief by appellant nor transcript or statement of facts regarding the previous proceedings.

Universal access to the courts is certainly not a novel concept in the annals of jurisprudence. Access to the courts was prized and protected by the Romans over 2,300 years ago. *See* Maguire, *Poverty and Civil Litigation*, 36 Harv. L. Rev. 361 (1964).[2]

It is regrettable in a social and cultural sense that in the United States progress in terms of simplified, easier access to the courts and the administration of justice has been somewhat less than impressive. Fifty years ago, in 1924-25, the American Bar Association's Committee on Legal Aid Work drafted a model Poor Litigant's Statute which provided, *inter alia*, that a poor litigant would be excused from giving security for costs and from payment of any fees. *See generally* Silverstein, *Waiver of Court Costs and Appointment of Counsel for Poor Persons in Civil Cases*, 2 Val. L. Rev. 21 (1967). But the ABA's model statute apparently has had only nominal influence in most jurisdictions in the development of poverty law. On the other hand, in *O'Connor v. Matzdorff*, 76 Wn.2d 589, 458 P.2d 154 (1969), the Supreme Court of Washington forthrightly provided some real judicial leadership in shaping the emerging rule that indigents should not be denied access to the justice system simply by reason of poverty. We perceive no adequate reasons to retreat from that leadership in the instant case.

The policy underlying equal access to the courts is not only sound but socially compelling. Our courts serve as a complaint desk for our society. Curiously enough, they have served reasonably well. Otherwise, the so-called social compact and our society as we know it might have come

[2]For further comparative studies, *see* Ginsberg, *The Availability of Legal Services to Poor People and People of Limited Means in Foreign Systems*, 6 Int'l Law. 128 (1971); Cappelletti, *Fundamental Guarantees of the Parties in Civil Litigation: Comparative Constitutional, International, and Social Trends*, 25 Stan. L. Rev. 651 (1972); Cappelletti & Gordley, *Legal Aid: Modern Themes and Variations*, 24 Stan. L. Rev. 347 (1972).

unglued ere now. But this is not time for equanimity or self-serving encomiums. Our court system is the central mechanism for the orderly resolution of disputes that arise in our society between citizens and between citizens and the government. Moreover, it is manifest that there is a direct relation between access to the courts and the exertion of power within the system relative to the evaluation and resolution of citizens' grievances. Failure to provide equal access to the courts demonstrates not only a poverty of sensitivity to social problems but also is fraught with the dangers of alienating our citizenry from the system and encouraging self-help with concomitant breaches of the peace and likely overtones of violence. Indeed, much of the turmoil in our country in recent years has been attributed to the "frustrations of the powerless." *See Report of the National Advisory Commission on Civil Disorders* 5 (1968); Note, *Boddie v. Connecticut: Free Access to Civil Courts For Indigents*, 76 Dick. L. Rev. 749 (1972). *See also* Abrams, *Access to the Judicial Process*, 6 Ga. L. Rev. 247 (1972). Obstacles to access to the courts and our justice system undoubtedly exacerbate such frustrations. Therefore, whether the issue involves a simple unlawful detainer action, a challenge to fundamental societal arrangements or values, or as here, a challenge to the legality of terminating one's employment, it is imperative that *all* citizens be afforded effective access to our justice machinery to redress their grievances.

Policy, of course, cannot be the sole determinant of whether indigent access fees should or must be waived. However, there are two distinct and independent legal doctrines which, we are convinced, require that the policy considerations enunciated above be effectuated in the instant case.

## I
### INHERENT POWER TO WAIVE COSTS

In *O'Connor*, where the plaintiff could not afford the fees at the trial court level, we gave expression to a broad fee

waiver power in the courts of this state. Recognizing that it would be a hollow gesture to insure access to the trial courts without affording an opportunity to review and correct errors made at the trial level, this court subsequently waived the *filing fee and bond for costs* on *appeal* for an indigent. *Iverson v. Marine Bancorporation*, 83 Wn.2d 163, 517 P.2d 197 (1973). Several California decisions are in accord. *See, e.g., Ferguson v. Keays*, 4 Cal. 3d 649, 484 P.2d 70, 94 Cal. Rptr. 398 (1971) (appellate filing fee); *Roberts v. Superior Court*, 264 Cal. App. 2d 235, 70 Cal. Rptr. 226 (1968) (appellate cost bond); *Bank of American Nat'l Trust & Sav. Ass'n v. Superior Court*, 255 Cal. App. 2d 575, 63 Cal. Rptr. 366 (1967) (nonresident plaintiff's cost bond); Note, *California's Civil Appeal in Forma Pauperis—An Inherent Power of the Courts*, 23 Hastings L.J. 683 (1972). *Cf. In re Karren*, 280 Minn. 377, 159 N.W.2d 402 (1968).

■ The State, nevertheless, urges that waiver of a *cost bond* would be improvident because it is designed as a means of protecting defendants from harassment and incurring unnecessary legal expenses on appeal. However, this consideration has been previously considered and adequately dispensed with in *Iverson* where we held that a defendant prevailing on appeal is authorized to file a claim with the legislature for the amount he is entitled to receive as costs, to the extent of the cost bond provided for in ROA I-22. *See also Honore v. State Bd. of Prison Terms & Paroles*, 77 Wn.2d 660, 466 P.2d 485 (1970).

■ The case at bar thus falls squarely within *Iverson*. The only difference is that this case involves an appeal from an *administrative* ruling. But this difference is surely irrelevant since erroneous rulings are no less likely to be rendered by administrative tribunals than by superior courts. Nor are we intimidated by the parade of horribles argument that the poor will en masse frivolously appeal from adverse administrative decisions. In· *O'Connor*, this court considered and explicitly rejected such an argument. Indeed, we labelled "groundless" the fears ·that the poor

would abuse the judicial process if given access to it. Moreover, certain requirements were delineated in *O'Connor* which are a sufficiently strong antidote to any possibility of the State funding frivolous appeals by the poor. The appellant must demonstrate both (1) bona fide indigency; and (2) that the claim is in good faith and with *probable merit*. If the appellant herein can meet these requirements, there is no justifiable reason for denying him review of the Superior Court's decision.

## II
### CONSTITUTIONAL RIGHT OF ACCESS TO THE COURTS

In *Boddie v. Connecticut*, 401 U.S. 371, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971), the Supreme Court of the United States enunciated what appeared to be the genesis for a general rule of access to the courts under the due process clause of the Fourteenth Amendment. *See generally* Note, *Indigent's Access to Civil Court*, 4 Colum. Human Rights L. Rev. 267 (1972); Note, *Boddie v. Connecticut: Free Access to Civil Courts For Indigents*, 76 Dick. L. Rev. 749 (1972); Note, *Access to Bankruptcy Court for Indigents: The Extension of Boddie v. Connecticut*, 16 St. Louis L.J. 328 (1971). This potentially catalytic decision, however, was restricted by the Burger court with a 5 to 4 decision in *United States v. Kras*, 409 U.S. 434, 34 L. Ed. 2d 626, 93 S. Ct. 631 (1973) (denial of waiver of filing fees for bankruptcy proceedings). This restriction of *Boddie* was subsequently reaffirmed in *Ortwein v. Schwab*, 410 U.S. 656, 35 L. Ed. 2d 572, 93 S. Ct. 1172 (1973) (denial of waiver of appellate filing fees for review of lowering of welfare benefits).

Notwithstanding *Kras* and *Schwab*, it is not yet certain that a case such as this would not require access to the courts pursuant to the Constitution of the United States. Several theories have been articulated upon which a right of access could be predicated. *See* Brickman, *Of Arterial Passageways Through the Legal Process: The Right of Universal Access to Courts and Lawyering Services*, 48 N.Y.U. L. Rev. 595, 628-37 (1973); Michelman, *The Supreme*

*Court and Litigation Access Fees: The Right to Protect One's Rights—Part I*, 1973 Duke L.J. 1153; Comment, *The Heirs of Boddie: Court Access For Indigents After Kras and Ortwein*, 8 Harv. Civ. Rights-Civ. Lib. L. Rev. 571 (1973); Note, *A First Amendment Right of Access to the Courts for Indigents*, 82 Yale L.J. 1055 (1973). However, *Kras* and *Ortwein* have left the matter in considerable doubt.[3] Rather than become enmeshed in the vagaries of the right of access to the courts pursuant to the federal constitution, we deem it preferable to consider the question under our own Washington Constitution.

In this regard, whatever one's rights may be pursuant to the federal constitution, the State of Washington is always at liberty to grant its citizenry broader rights. Because of our conviction that judicial trepidation in the face of social need should not prevail, we forthrightly predicate a general right of access to the courts upon the Washington Constitution. After all, our constitution was drafted to be used.

In order to assess the constitutionality of impediments placed upon access to the courts, both the nature of the asserted right and the reasons for the restrictions placed upon it by the State must be considered.

In weighing the nature of a right, it is clear that the fact that it is not specifically mentioned in the constitution is not dispositive. For instance, both the right to travel, *Shapiro v. Thompson*, 394 U.S. 618, 22 L. Ed. 2d 600, 89 S.

---

[3]*Kras* and *Ortwein* have also met with a flurry of criticism, to which we subscribe. The most objectionable defect in analysis is the reliance by the court on the alleged existence of "alternatives" to access to the judicial system as a justification for distinguishing *Boddie*. The court is apparently satisfied if the alternatives are simply *theoretical*, even if patently ineffective, as in *Kras*, where there existed the theoretical opportunity to negotiate with creditors rather than to go into bankruptcy. *See* Brickman, *Of Arterial Passageways Through the Legal Process: The Right of Universal Access to Courts and Lawyering Services*, 48 N.Y.U.L. Rev. 595, 614-16 (1973); Comment, *The Heirs of Boddie: Court Access For Indigents After Kras and Ortwein*, 8 Harv. Civ. Rights-Civ. Lib. L. Rev. 571, 578-80 (1973).

Ct. 1322 (1969), and the right to privacy, *Griswold v. Connecticut*, 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965); *Eisenstadt v. Baird*, 405 U.S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029 (1972), are both fundamental rights under the Constitution of the United States although nowhere specifically so mentioned.

■ At least two different rationales lead to the conclusion that, in Washington, the right of access to the courts entails a fundamental right. First, some rights are the essential basis for the assertion of all other rights. Thus, the right to travel is the essential basis for the assertion of the right to work, to pursue one's economic and social well being, et cetera. Similarly, the right to vote is aimed at preserving an assortment of democratic values. Thus, some rights are "preservative of all rights" and are therefore deemed fundamental. The right of access to the courts is such a right since the judicial system is the central institution for the assertion, protection, and enforcement of most other rights in our society. *See* Goodpaster, *The Integration of Equal Protection, Due Process Standards, And the Indigent's Right of Free Access to the Courts*, 56 Iowa L. Rev. 223, 249-56 (1970); Michelman, *The Supreme Court and Litigation Access Fees: The Right to Protect One's Rights —Part II*, 1974 Duke L.J. 527, 534-39. Accordingly, we consider access to the courts to be a fundamental right.

As an alternative predicate for the conclusion that access to the courts is a fundamental right, reference can be had to Const. art. 1, § 4:

The right of petition and of the people peaceably to assemble for the common good shall never be abridged.

■ The historical roots of the right to petition can be traced to the Magna Carta and the Declaration of Rights of 1689. *See generally Sources of Our Liberties* 21 (R. Perry ed. 1959). The initial question is whether the right to petition, as embodied in our Washington Constitution, contemplates petitioning the legislature, executive, or the judiciary. At the very least, the right to petition must include

petitioning the judiciary, for it is this branch of our system of government that is the final arbiter of our constitution and that has the ultimate power to redress grievances arising from unconstitutional legislative action. Moreover, the judiciary is the ultimate enforcer of common-law rights, and this enforcement process can be commenced only if our citizenry has the right to petition the judiciary and invoke its machinery. *See* Note, *A First Amendment Right of Access to the Courts for Indigents*, 82 Yale L.J. 1055, 1059-60 (1973). Accordingly, we hold that the explicit provision in our constitution preserving the right to petition for grievances encompasses and, indeed, makes fundamental the right of access to the courts.[4]

In addition to a fundamental right being involved in this case, a classification is made on the basis of *wealth* that is determinative of who will and who will not be afforded access to the courts. The states in the northwestern United States, particularly Washington, are steeped in a historical tradition in which wealth and status are of only secondary importance in our scheme of values. Indeed, Washington is well noted for its populist tradition. *See generally* M. Avery, *History And Government of the State of Washington* 199-216. (1961). Against this backdrop of our Washington Constitution, classifications based upon wealth are indeed dubious.

It is in this reference-frame that the equal privileges and immunities clause of our state constitution should be construed. Const. art. 1, § 12 provides:

---

[4] A similar fundamental right to petition the judiciary may be in the process of development under the United States Constitution, amendment one. *Cf. NAACP v. Button*, 371 U.S. 415, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963); *Brotherhood of R.R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 12 L. Ed. 2d 89, 84 S. Ct. 1113, 11 A.L.R.3d 1196 (1964); *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576. 28 L. Ed. 2d 339, 91 S. Ct. 1076 (1970). *See also* Willging, *Financial Barriers And the Access. of Indigents to the Courts*, 57 Geo. L.J. 253, 281-85 (1968); Note, *Free Access to the Courts As A Fundamental Constitutional Right*, 8 New Eng. L. Rev. 275, 297-300 (1973); Note, *A First Amendment Right of Access to the Courts For Indigents*, 82 Yale L.J. 1055 (1973). *But see Ortwein, supra.*

> No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not *equally* belong to all citizens, or corporations.

(Italics ours.)

■ Analytically, this case involves an "intersection" between our equal protection clause and a fundamental right. *Cf. Police Dep't v. Mosley*, 408 U.S. 92, 33 L. Ed. 2d 212, 92 S. Ct. 2286 (1972). In this posture, a compelling state interest must be demonstrated to justify affording some citizens, but not others, the right to appeal. *Eggert v. Seattle*, 81 Wn.2d 840, 505 P.2d 801 (1973); *Hanson v. Hutt*, 83 Wn.2d 195, 517 P.2d 599 (1973). In this case, both the filing fee required by ROA I-10 and the posting of a bond for costs as required by ROA I-22 have been challenged; each must be analyzed separately.

The traditional arguments justifying filing fees are: (1) they raise revenue which helps maintain the cost of the court system; and (2) they deter frivolous suits. It seems clear that allegedly recouping court costs via filing fees is makeweight at best, since it is now well established that only a small percentage of court expenses is met by this method. *See* Note, 45 Wash. L. Rev. 389, 398, n.47 (1970). Additionally, an alternate type of *legislative* funding, less onerous to the poor, is certainly a viable possibility. Nor can the usage of filing fees to deter frivolity be justified, for such fees will have only a marginal impact upon the affluent, whereas they will likely dissuade or entirely preclude the poor from asserting *even meritorious claims* in the courts. Thus, with respect to the poor, employing filing fees as a mechanism for deterring frivolous cases or controlling the workload of the courts is clearly overbroad. *See generally* Note, *A First Amendment Right of Access to the Courts for Indigents*, 82 Yale L.J. 1055, 1068-69 (1973); Michelman, *The Supreme Court and Litigation Access Fees: The Right to Protect One's Rights—Part II*, 1974 Duke L.J. 527, 558-63.

Imposition of bond requirements upon a litigant as a prerequisite to taking an appeal raises somewhat different considerations, for the purpose of the bond is to protect the adverse party. Nevertheless, bond requirements are fraught with the same defect as are filing fees, *viz.*, they deter the pursuit of meritorious claims in the appellate courts. In addition, less onerous methods are certainly available to protect defendants from incurring unjust appellate court costs. Indeed, in *Iverson v. Marine Bancorporation,* 83 Wn.2d 163, 517 P.2d 197 (1973), we recognized the availability and adequacy of other alternatives to protect defendants. Therein we held that a prevailing defendant could petition the legislature for reimbursement of costs. *See* discussion *infra. See also* Brickman, *Of Arterial Passageways Through the Legal Process: The Right of Universal Access to Courts and Lawyering Services,* 48 N.Y.U.L. Rev. 595, 640 (1973).

Under these circumstances, we cannot realistically conclude that there is a compelling state interest that justifies opening the gates of the judicial system to the affluent but closing them to the poor.

However, it does not follow that the State must provide *free* access to the courts under any and all circumstances. We think that before the State is constitutionally compelled to provide *free* access, it may require a showing of (1) bona fide indigency and (2) probable merit to the claim. Nonindigents need not be provided free access to the courts because the State has a valid interest in generally requiring the citizenry who invoke the judicial process to help fund its operation. This interest is valid as against nonindigents because it will not preclude them from the judicial system.

The State may also require the indigent to demonstrate the probable merit of the claim before free access is provided because the State certainly has a valid interest in preventing frivolous claims from wasting judicial time and resources. It is true that a similar requirement is not

imposed upon the more affluent before they may gain access to the courts, but "[i]t is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 110, 93 L. Ed. 533, 69 S. Ct. 463 (1949). *Cf. Morey v. Doud,* 354 U.S. 457, 1 L. Ed. 2d 1485, 77 S. Ct. 1344 (1957); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 99 L. Ed. 563, 75 S. Ct. 461 (1955). It certainly is not unreasonable for the State to require that the litigation it finances is not frivolous. As such, equal protection does not demand that the poor be provided with identical means as the wealthy to circumvent the State's valid interest in preventing frivolous claims. Nor do we think that the fundamental right of access to the courts is of such magnitude and weight as to require the State to fund frivolous claims.

But we do hold that barring a bona fide indigent from the courts who has a claim with probable merit is violative of Const. art. 1, § 12.

The preceding analysis of state constitutional provisions is by no means novel, but on the contrary is well supported. Arizona has construed its equal privileges and immunities clause, which is identical in language to that in the Washington Constitution, to require an equal opportunity to appeal regardless of financial status. *Hampton v. Chatwin,* 109 Ariz. 98, 505 P.2d 1037 (1973) (waiver of cost bond on appeal). *See also Harrington v. Harrington,* 269 A.2d 310 (Me. 1970); *Chambers v. District Court,* 261 Iowa 31, 152 N.W.2d 818 (1967).

As a final observation, we find merit in the suggestion of amicus curiae that future motions for waiver of court access costs and fees should follow a simpler procedure. The current procedure, outlined in *Iverson,* contemplates (1) a hearing by this court on the motion to proceed in forma pauperis; (2) with subsequent remand to the superior court for factual determinations regarding indigency, good faith, probable merit, et cetera; and (3) then an appeal on the merits.

To facilitate disposition and, hopefully, to avoid unnecessary expenditure of time and effort by the court and the parties, future appeals of this nature should take a less tortuous path. Henceforth, the motion to waive appellate court costs should be made in the court to which the appeal will be taken—normally the Court of Appeals. That court should then summarily remand the case for the determinations enunciated in *Iverson* at page 165. After such determinations and findings are made by the Superior Court, the appellate court may then review and determine the forma pauperis motion, and then simultaneously consider the merits of the appeal in one unitary adjudication.

The cause herein should be remanded to the Superior Court for proceedings consistent with the views expressed herein and in *Iverson*. It is so ordered.

HUNTER and WRIGHT, JJ., concur.

UTTER, J. (concurring)—I concur in the result of the majority and its reasoning insofar as it discusses Const. art. 1, § 4 and Const. art. 1, § 12. We are free to apply a less restrictive interpretation to these sections of our constitution than the United States Supreme Court did in discussing the due process and equal protection clauses of the Fourteenth Amendment in *Ortwein v. Schwab*, 410 U.S. 656, 35 L. Ed. 2d 572, 93 S. Ct. 1172 (1973). *See Robinson v. Cahill*, 62 N.J. 473, 303 A.2d 273, 282 (1973), *modified on grounds not here applicable*, 63 N.J. 196, 306 A.2d 65 (1973). In addition, the waiver of the cost bond in this case will affect an agency of the state and as such, its cost, if any, will be shared by all the people of the state.

HOROWITZ, J., concurs with UTTER, J.

STAFFORD, C.J. (dissenting)—The narrow issue before us is whether an alleged indigent is entitled to a waiver of a filing fee and of a bond for costs on the appeal of a superior court's order affirming an order of the Higher Education Personnel Board reached as a result of an administrative hearing and review provided by statute.

In *Iverson v. Marine Bancorporation,* 83 Wn.2d 163, 517 P.2d 197 (1973), we waived the filing fee and the required bond for costs on appeal for an indigent appellant. Basically, the majority suggests that we should follow the same course here. However, *Iverson* is not apposite. It involved an initial appellate review of a superior court judgment awarding damages in a civil action for wrongful eviction. On the other hand, in the case at hand, appellant seeks review of an *administrative ruling* previously affirmed by the Higher Education Personnel Board and by the Superior Court after a hearing and review in each instance.

There is no adequate reason to extend the rationale of *Iverson* to the vast realm of administrative decisions. I would hold that appellant is not entitled to a waiver of the filing fee and the bond for costs on appeal to this court.

In *Ortwein v. Schwab,* 410 U.S. 656, 35 L. Ed. 2d 572, 93 S. Ct. 1172 (1973),[5] the petitioners sought waiver of a filing fee required for review of an administrative order reducing their welfare payments. Petitioners alleged they were indigent and unable to pay the fee required to obtain review by the Oregon Court of Appeals. In a per curiam opinion, the United States Supreme Court held that Oregon's appellate court filing fee did not violate the due process or equal protection clause of the Fourteenth Amendment.

In Oregon,[6] as in this state, judicial review of the agency's decision is authorized.[7] In Oregon that judicial review is first made by the Court of Appeals. Here, judicial review is first made by the Superior Court,[8] with appeal available to the Supreme Court as in other civil cases.[9] In both states parties seeking the appellate court review provided are required to pay a filing fee and provision is made for the giving of a bond.[10] Thus, the similarity between the two

---

[5]*Accord, Hill v. Michigan,* 488 F.2d 609 (6th Cir. 1973).

[6]Ore. Rev. Stat. § 183.480 (1971).

[7]RCW 28B.16.150-.160.

[8]RCW 28B.16.150.

[9]RCW 28B.16.160.

[10]Ore. Rev. Stat. § 183.480 (1971); ROA I-22.

administrative systems is immediately apparent. In Washington, however, an appellant is even entitled to an additional judicial review of an adverse administrative ruling without the necessity of posting a bond (*i.e.*, at the superior court level).

Turning again to *Ortwein*, the Supreme Court stated that in *United States v. Kras*, 409 U.S. 434, 445, 34 L. Ed. 2d 626, 93 S. Ct. 631 (1973), they had observed "one's interest in a bankruptcy discharge 'does not rise to the same constitutional level' as one's inability to dissolve his marriage except through the courts."[11] *Ortwein* also held that the increased welfare payments, sought by appellants, had far less constitutional significance than the interest of the appellant who sought a divorce in *Boddie v. Connecticut*, 401 U.S. 371, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971). The *Ortwein* court, at pages 659-60, went on to make the following comments which are directly applicable to the administrative process here under review.

> Each of the present appellants has received an agency hearing at which it was determined that the minimum level of payments authorized by law was being provided. As in *Kras*, we see "no fundamental interest that is gained or lost depending on the availability" of the relief sought by appellants. 409 U. S., at 445.
>   . . .   In *Kras*, the Court also stressed the existence of alternatives, not conditioned on the payment of the fees, to the judicial remedy. . . . The Court has held that *procedural due process requires that a welfare recipient be given a pretermination evidentiary hearing.* . . . *These appellants have had hearings. The hearings provide a procedure, not conditioned on payment of any fee, through which appellants have been able to seek redress. . . .*
>   . . . As in *Kras*, this litigation, which deals with welfare payments, "is in the area of economics and social welfare." . . . No suspect classification, such as race, nationality, or alienage, is present. . . . The *applica-*

---

[11]*Ortwein v. Schwab*, 410 U.S. 656, 659, 35 L. Ed. 2d 572, 93 S. Ct. 1172 (1973), was referring to *Boddie v. Connecticut*, 401 U.S. 371, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971).

*ble standard is that of rational justification . . .*
The purpose of the filing fee, as with the bankruptcy fees in *Kras,* is apparent. *The Oregon court system incurs operating costs, and the fee produces some small revenue to assist in offsetting those expenses. . . .* Appellants do not contend that the fee is disproportionate or that it is not an effective means to accomplish the State's goal. *The requirement of rationality is met.*

(Footnotes omitted. Italics ours.)

In the instant case appellant, as with petitioners in *Ortwein,* had redress from the agency's termination of his services (*i.e.,* the University of Washington) by means of an evidentiary hearing and review by the Higher Education Personnel Board. That hearing and review, as with petitioners in *Ortwein,* was not conditioned upon payment of any fee. Thus, there is "no fundamental interest that is. gained or lost depending on the availability" of the relief sought by appellant. *United States v. Kras, supra.* Nor is any suspect classification such as race, nationality or alienage present. Consequently, the applicable standard is that of rational justification.

As spelled out in *Ortwein,* the fact of charging a fee at the judicial appellate level is not in and of itself evidence of a denial of .due process or equal protection. The case went on to point out that there existed a rational relationship between the small fee charged and the revenue necessary to assist in offsetting the costs of judicial operation. The same may be said of the bond for costs.

In the instant case it is not seriously argued that either the filing fee or the required bond for costs on appeal is disproportionate. Likewise it is not suggested that it is not an effective means to accomplish the State's goal.

I would deny appellant's motion for waiver of the filing fee and the posting of a bond for costs on appeal.

BRACHTENBACH, J., concurs with STAFFORD, C.J.

SOULE, J.* (dissenting)—I concur in the dissenting opinion of Justice Stafford and would say more.

I fully support the position expressed by Justice Hale in his dissent to *Iverson v. Marine Bancorporation,* 83 Wn.2d 163, 517 P.2d 197 (1973), and express the same concerns which were there expressed about the very constitutionality of this court's action.

In addition I would direct particular attention to the problem of waiving a cost bond. The origin of the right to a cost bond is statutory (Laws of 1893, ch. 61, § 6, p. 122) and has been carried into the court rules through the legislation which granted to the Supreme Court of this State the right to make rules regulating pleading, practice and procedure (Laws of 1925, 1st Ex. Sess., ch. 118, § 1, p. 187).

Though provision for a cost bond be now governed by rule rather than statute, it seems self-evident that the right to a cost bond is substantive in its nature and a contingent property right of a successful party litigant. Such a bond is quite different in nature from the right of the State of Washington to charge a fee for access to the court. It being a right of the party and not of the State itself, I question the power of the court to waive it.

The rationale of the concurring majority opinion[12] begs the question. In the case at bench the State is a litigant as well as the provider of the forum and should be accorded the same rights and security as any other litigant.

If the right to a cost bond be substantive, the majority suggestion that the remedy for the loss of security is to be recompensed by submission to the legislature of a private bill for relief is not only illusory, but itself a patently unlawful proposal. It is generally recognized that private property, be it real or personal, may not be appropriated even for public purposes without payment of just compen-

---

*Justice Soule is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amendment 38).

[12]"In addition, the waiver of the cost bond in this case will affect an agency of the state and as such, its cost, if any, will be shared by all the people of the state."

sation. 3 P. Nichols, *Law of Eminent Domain* § 8.1(2) (3d ed. 1974); 1 P. Nichols, *Law of Eminent Domain* § 2.1(2) (3d ed. 1974).

I know of no cases which hold that the right to ask the legislature for relief through a private bill is the equivalent of just compensation, and indeed, the suggestion is inconsistent with the general rule that compensation must be in money and must be unconditional. 3 P. Nichols, *Law of Eminent Domain* § 8.3 (3d ed. 1974).

Further, I am unable to accept as valid one of the basic premises of both *O'Connor v. Matzdorff*, 76 Wn.2d 589, 458 P.2d 154 (1969) and *Iverson v. Marine Bancorporation, supra.*

Fundamental to the reasoning of those decisions is the concept that because the court makes the rules, it can waive them. This is the essence of the rule of man rather than the rule of law, and in the assertion of this power, the court in my opinion, is resorting to the same tactics as those by which Henry IV achieved the throne of England.

At a time when this court took a more restrained view of the limits of its powers, the court said in *State v. Currie*, 200 Wash. 699, 94 P.2d 754 (1939), at 707:

> Finally, although the matters with which we are dealing are embraced in what we call a rule, it is that kind of a rule which has all the force of a statute, since it was promulgated at the direct command of the legislature "to promote the speedy determination of litigation." It is true that the court has the power to change and rewrite the rule, but that is a very different thing from excepting a particular individual from its operation or excusing its violation in a particular instance. That, the court has no power to do.

Even with subsequent relaxation arising in selected capital criminal cases as reviewed in *O'Connor v. Matzdorff, supra*, the *Currie* rule is still reasonable and workable. If the rule needs amending, it should be done through the rule-making processes, not through the unrestrained use of exceptions in the decision-making processes of this court

whereby any five of nine men at any given time, and on any given occasion, can cast aside the composite efforts of this court, the members of the Judicial Council and such other aides as the court chooses to use in composing its rules and as radically alter the framework of the law for litigants as was done by the decision of *Iverson v. Marine Bancorporation, supra,* and now by this decision.

The majority opinion, in purporting to find a "socially compelling" reason for waiving the cost bond has evaded both the legislative and the deliberative rule-making process. In so doing it has created the perfect instrument for filling the dockets with frivolous litigation. Whether the members of this court are aware of it or not there is a philosophy expressed by some lawyers found in publicly financed law offices that if a person is indigent and wants to be heard in court he is entitled to that hearing even though the lawyer knows that the cause or defense has no merit in fact.

There is no limit to the quantity of frivolous complaints and sham defenses which can be presented when the indigent client is matched with the professionally irresponsible lawyer whose fees are paid from the public purse. The majority recognizes the problem when it suggests that a showing of indigency is necessary, together with a showing of probable merit. I suggest that the realities of the trial of cases is such that the resolution of the question of probable merit can effectively be done only in a hearing which is substantially equivalent to the trial itself. From the viewpoint of this writer, which is principally that of a trial judge, the suggested control is as ineffectual as the so-called *Anders* brief approach to criminal appeals. The time spent determining the presence or absence of merit approximately equals the time spent in the outright trial.

In my opinion the court should recognize that it has glaringly invaded the field of the legislature by imposing on the State of Washington a drastic change in the social structure as it relates to the processing of litigation. The

court should forthrightly abandon its misguided position, as it did in *Greene v. Rothschild*, 68 Wn.2d 1, 402 P.2d 356 (1968).

The constitutional power to declare social policy and implement it with appropriate funding properly lies with the legislature, not with the court. Certainly this appears to have been the intention of the drafters of the United States Constitution.

In the Federalist No. 78, at 227 (R. Fairfield ed. 1966) (A. Hamilton), we find:

> Whoever attentively considers the different departments of power must perceive, that, in a government in which they are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the Constitution; because it will be least in a capacity to annoy or injure them. The Executive not only dispenses the honors, but holds the sword of the community. The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither FORCE nor WILL, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments.

(Footnote omitted.)

What hollow words. I dissent.