[No. 20247.   *En Banc.*   February 4, 1927.]

THE STATE OF WASHINGTON, *on the Relation of Chelan Electric Company, Plaintiff,* v. THE SUPERIOR COURT FOR CHELAN COUNTY *et al.,* *Respondents.*[1]

[1] EMINENT DOMAIN (25)—PUBLIC USE—PRODUCTION AND SUPPLY OF ELECTRIC POWER. The appropriation of water by a public service corporation to generate electric power to be sold to the public generally for manufacturing, domestic and professional purposes is a public use; in view of the changed conditions and universality of the use of electric power in this state and the enactment of laws by which the distribution, rates, and charges to the public therefor are subjected to regulation and control by public authorities.

[2] SAME (114)—PROCESS (1)—CONSTITUTIONAL PROVISIONS—FORM OF SUMMONS. The notice given in proceedings for the appropriation of land stands on the footing of a summons in a civil action, and is not "process" which, by Const. Art. IV, § 27, is required to run in the name of the state; and the court therefore acquires jurisdiction although the notice does not run in the name of the state.

[3] SAME (119)—PLEADING—DESCRIPTION—SUFFICIENCY. The description of the property to be taken in condemnation proceedings is sufficient to give the court jurisdiction where the courses are given in the technical language of a civil engineer versed in such matters, and can be made more certain and definite upon demand.

Certiorari to review a judgment of the superior court for Chelan county, Parr, J., entered September 25, 1926, denying public use and necessity in condemnation proceedings. Reversed.

*Post & Russell, Thomas Balmer* and *Edwin C. Matthias,* for relator.

*Shorts & Denney, Wm. A. Grimshaw, O. P. Barrows* and *Frederick Kemp,* for respondents.

[1]Reported in 253 Pac. 115.

ASKREN, J.—This is a certiorari proceeding to review an order denying an application for an adjudication of public use and necessity in a condemnation case.

The facts follow: Relator is a public service corporation which desires to expropriate the right to overflow certain lands of the respondents for the purpose of raising the surface of Lake Chelan, and thereby developing a large amount of electric energy. The primary purpose of the corporation appears to have been to furnish motive power for the operation of the trains of the Great Northern Railway Company, but, owing to the fact that the railway company has not yet started the development of its properties for that purpose, it was deemed better to allow the development of the power site to be handled by a company already actively engaged in that business, and which would have immediate demand and sale for the energy thus produced. To this end all of the stock, save five qualifying shares, were sold to the Washington Water Power Company, which company agreed to develop the project and sell electricity to the railroad, when and as it became needed through the electrification of its railroad lines.

The Washington Water Power Company, which thus became practically the sole owner of the relator company, has been engaged in business in this state for many years supplying electric energy to a very large extent in eastern Washington, and to a lesser extent in the neighboring state of Idaho. It has five water power sites on the Spokane river in this state, and one in Idaho. It supplies electric energy to other public service corporations for the operation of railways and electric lines, furnishes power to municipalities and the inhabitants thereof for lighting streets and homes, as well as supplying power for general uses. Its present capacity of electric energy is insufficient for the demands made upon it, and, in 1925 and 1926, it was

obliged to purchase power to avoid a shortage. To overcome the shortage and comply with new contracts, it is seeking to develop the Lake Chelan project. The power produced at this project will be delivered to it, and from it to its customers in the state of Washington. About eighty-five per cent of all the energy produced, including the Lake Chelan project, will be devoted to lighting homes, buildings, streets, public buildings, operation of railroad, street and interurban railways, pumping water for irrigation, pumping for municipal water supply systems, and the operation of domestic appliances.

The use for all the purposes mentioned has heretofore, by our decisions, been declared to be a public use, with the exception of the operation of domestic appliances. We have not been called upon to construe its use in this connection. Its use, however, in the manifold ways to which it is capable of being put, is seemingly limited only by the number of appliances found in the home itself. It is used for cooking, heating, operating washing machines, ironers, and other like devices. Its use is almost as universal in the home for these things as it is for light itself, and we think that such a use should be classified as a public use.

The balance of the generated power, fifteen per cent, will be applied to uses which we have heretofore held to be private, being for mining and manufacturing purposes. The use for manufacturing purposes includes everything in a commercial way to which power of this character can be applied, and takes in almost every known business, together with many of the professions, and since the universality of its use is urged upon us here in behalf of relator, we feel justified in setting out some of these uses. They are: refrigeration in stores and cafes; grinding, slicing, air and water heat-

ing and refrigeration in butcher shops; mixing machines and ovens in bakeries; water heating and popcorn machines in confectioneries; trip hammers and emery wheels in machine shops; repair and sewing machines in shoe repairing places; sewing machines used by dressmakers, tailors and harness shops; clippers, vibrators, etc., used by barbers; sterilizers and X-ray machines used by physicians; drills, compressors, water heaters, sterilizers and X-ray machines used by dentists; coffee urns, soup plates and water heaters used in cafes; presses, moulders and melting pots used by printers; blowers, chop mills and elevators used by grain elevators; water and air heaters, irons, mangles and washing machines used in laundries; trip hammers and emery wheels used in blacksmith shops; motor generators, air pumps, rectifiers, buffers, air heaters, lathes, and shapers used in garages.

The trial court denied the adjudication of public use upon the ground that it felt bound by the prior decisions of this court, holding that power for manufacturing purposes was private, and not a public use, and that, where the power is to be devoted partly for public and partly for private uses, the right to use the power of eminent domain should be denied.

[1] Relator has earnestly prayed in this court for a rescission of the rule laid down in our previous cases to the effect that such uses as manufacturing and mining are private, and we feel constrained to re-examine these cases.

The first case involving this question was *State ex rel. Tacoma I. Company v. White River P. Co.,* 39 Wash. 648, 82 Pac. 150, 4 Ann. Cas. 987, 2 L. R. A. (N. S.) 842. In that action the respondent sought to condemn and expropriate lands for the purpose of storing water and creating electric energy. The adjudication for a public use was ordered by the trial court, and re-

versed on appeal upon the ground that the power was not to be put to a public use. An exhaustive opinion was filed setting forth the views of this and other courts as to what constitutes a public use. The court found, as one of the grounds for holding that it was not a public use, that:

"It is not claimed that there is a present demand for the 50,000 electrical horse-power. It is not claimed that the respondent has a franchise to enter any of the cities or towns mentioned, or that it will or can obtain one. It does not appear that there are any street or other railways to utilize its product. It is not under contract or obligation to furnish electricity to any person, or for any purpose. Under its articles, it may erect and maintain mills and manufactories and operate the same. For aught that appears, aside from its professions and voluntary promises, it may take the relator's property, generate electricity or not, at will, and use the same for any purpose, public or private, to suit its convenience."

In the same opinion reference was made to the claim of the respondent therein that the use became public by reason of Article XXI of the state constitution, which reads:

"The use of the waters of this state for irrigation, mining and manufacturing purposes shall be deemed a public use."

In reply to this contention it was said:

"We are not called upon, at this time, to determine the full import or meaning of this constitutional provision. What we have already said disposes of the question before us. If it was intended by the article in question to extend the right of eminent domain to private manufacturing corporations, or to authorize the taking of private property for a private use, it violates the due process clause of the Federal Constitution. A state is powerless, by statute or by constitutional provision, to declare a use public which is essentially and inherently private."

The next important case in this connection is *State ex rel. Harris v. Superior Court,* 42 Wash. 660, 85 Pac. 666, 7 Ann. Cas. 748, 5 L. R. A. (N. S.) 672, where an order of public use entered by the trial court in an action to expropriate land for the purpose of generating electricity for the operation of a light plant and electric car system, and in addition thereto power for general uses, was reversed upon the ground that the use of power for general purposes was not a public use, relying on the previous decision in *State ex rel. Tacoma I. Co. v. White River P. Co., supra.*

In *State ex rel. Tolt P. & T. Co. v. Superior Court,* 50 Wash. 13, 96 Pac. 519, the same question was raised and it was decided without argument in conformity with and reliance upon the *White River* and the *Harris* cases.

In *State ex rel. Public Service Commission v. Spokane & I. E. R. Co.,* 89 Wash. 599, 154 Pac. 1110, the public service commission was denied access to the contracts of the railway company for rate-making purposes, upon the ground that the sale of surplus power for private business was not engaging in a public business; citing as authority therefor the cases previously cited herein.

In *State ex rel. P. S. P. & L. Co. v. Superior Court,* 133 Wash. 308, 233 Pac. 651, following our previous cases, we denied the right of eminent domain to a power company which desired an easement for a power line to be used to carry electric current devoted partly to private and partly to public uses.

Relator frankly concedes at the outset that these cases are, apparently at least, against its contention, but urges that, in view of the changed conditions of society, and the universal use to which electric power is put in the state of Washington, we are justified in overruling whatever prior decisions seem to present a

holding that electric energy produced by water power is not devoted to a public use when applied to mining and manufacturing purposes.

The contention is indeed meritorious. At the time the decision in the *White River* case was rendered, there was very little use of electric power in a commercial way in this state. In the twenty-two years that have elapsed since that time, we have seen the uses multiplied a thousand-fold, until there is scarcely an industry of any kind that has not felt the beneficent influence of electrical energy, and it can almost be said that its use is universal. The inadequacy of use by the general public is a test universally established. *Clark v. Nash,* 198 U. S. 361; *Strickley v. Highland Boy Mining Co.,* 200 U. S. 527. What is a public use has for years perplexed the courts and text-writers, and no satisfactory exposition has ever been given which attempted to include those things which have been so held, for the changing conditions of society require new and constant changes. In the *Harris* case, *supra,* we referred specifically to this point in the following language:

"It must be admitted that many things are considered a public use now that were not so considered a half or even a quarter of a century ago, and it may be, and it is probable, that in the not distant future many things which are now considered a private use, by the changing conditions and evolution of business, will of necessity become a public use, but until such change is made manifest private property must be protected from condemnation in that behalf."

As bearing on the precise use of electric power to which the *Harris* case has application, and showing the limited use then made of it, it is interesting to note that the court cited with approval and set out a portion of the opinion of the Maine court, in *Brown v.*

*Gerald,* 100 Me. 351, 61 Atl. 785, 109 Am. St. 526, 70 L. R. A. 472, as follows:

"We think that the ultimate use of the power is an important consideration. If that use is essentially a private use, in a private business, will it become a public use by merely multiplying the number of persons who may have occasion to use the power? If it would not be a public use to supply power for one mill, would it be such to supply for two mills, or for six, or for twelve? We think not. In each individual case, it would be supplying the power for a private use. If the state cannot take the property of one and give the use of it to another for private use, can it give the use to that other, in order that in the form of electric power he may distribute the use to a dozen others for their private business purposes? We think not. There is no underlying necessity or peculiarity in the business of distributing electric power which requires any such enlargement of the power of eminent domain. There seems to be such a necessity in the cases of all quasi public corporations which we have mentioned. Railroads and telegraph, telephone, and water companies cannot be built and maintained by individuals for their several use, each one for himself. There is an 'impossibility', to use Judge Cooley's words, 'of making provisions for them otherwise' than through the power of eminent domain. But every man can, if he wishes, have a mechanical power of his own, either steam, or water, or electric. He can serve himself, without the intervention of the state. Not so conveniently or advantageously, perhaps, as it would be to be served by others. But mere convenience and advantage in private business must yield to the property rights of citizens sacredly guarded by the Constitution."

A reading of the whole opinion in the Maine case discloses the fact that it was sought therein to condemn in order to produce power to be devoted to a single mill. The excerpt quoted above that the delivery of power to one mill would not make it a public use, and that the delivery to six, or even a dozen, mills would

also be insufficient, is not opposed to the point urged here, for the use made of the power would be far from a general or public use. But that such a principle has no application to a case like this one, where almost every character of business desires, needs and uses electric power, must be apparent. The Maine court never had such a situation as this in contemplation, for that portion of the excerpt which says that "every man can, if he wishes, have a mechanical power of his own, either steam, or water, or electric. He can serve himself without the intervention of the state" could well be applied to some large industrial plants, but would be absurd if applied to dentists, physicians, printers, bakers, butchers, dressmakers, tailors, and many other users heretofore set out. The observation of the United States supreme court in *Mt. Vernon-Woodberry Cotton Duck Co., v. Alabama Interstate Power Co.,* 240 U. S. 30, that the use of electric energy for all purposes is a public use, is pertinent and we quote it:

"The principal argument presented that is open here, is that the purpose of the condemnation is not a public one. The purpose of the power company's incorporation and that for which it seeks to condemn property of the plaintiff in error is to manufacture, supply, and sell to the public, power produced by water as a motive force. In the organic relations of modern society it may sometimes be hard to draw the line that is supposed to limit the authority of the legislature to exercise or delegate the power of eminent domain. But to gather the streams from waste and to draw from them energy, labor without brains, and so to save mankind from toil that can be spared, is to supply what, next to intellect, is the very foundation of all our achievements and all our welfare. If that purpose is not public we should be at a loss to say what is. The inadequacy of use by the general public as a universal test is established. *Clark v. Nash,* 198 U. S. 361;

*Strickley v. Highland Boy Mining Co.,* 200 U. S. 527, 531."

It is said that the portion of the decision in the *White River* case which apparently holds that the provision in our state constitution that the use of water for manufacturing is a public use, is contrary to the Federal constitution due process clause, was erroneous in view of certain later decisions of the United States supreme court, which hold to the contrary. These are: *Strickley v. Highland Boy Mining Co.,* 200 U. S. 527, where the right of eminent domain to condemn a right-of-way for an aerial bucket line and support tower across a placer mining claim was upheld; *Otis Company v. Ludlow Manfg. Co.,* 201 U. S. 140, upholding the right to construct dams and overflow property to develop power for manufacturing purposes; and *Mt. Vernon-Woodberry Cotton Duck Co. v. Alabama Interstate Power Co., supra,* where the manufacture, supply and sale to the public of power produced by water as a motive force for industrial purposes is held to be a public use and not contrary to the due process clause. From these cases it will be seen clearly that article XXI of our constitution does not conflict with the Federal constitution.

We have had occasion, since the decision in the *White River* case, to give effect to the provisions of article XXI of the state constitution, in *State ex rel. Galbraith v. Superior Court,* 59 Wash. 621, 110 Pac. 429, where the right of eminent domain was allowed to a private owner of agricultural lands to condemn lands for irrigation ditches; and again in *State ex rel. Andersen v. Superior Court,* 119 Wash. 406, 205 Pac. 1051. These decisions indicate our views that, while the question of whether a use is public is one for the courts to determine, great weight should be given the declaration of the constitution that the use of waters of the

state for mining, irrigation and manufacturing are public uses. It will not do to read out of the constitutional provision the words "mining and manufacturing" and leave irrigation alone to be declared a public use. We must assume that the words were used advisedly by the framers of the constitution, who understood the state and its needs. We think there can be no question but what the uses of electricity for mining and manufacturing are also public uses.

However, the criticism directed to that part of the decision in the *White River* case is hardly justified, for it does not hold directly that, if the manufacturing use be such as would fairly make it a public use, there would then be a conflict; but, only, if the right of eminent domain was intended to be given to private manufacturing corporations, or to authorize the taking of private property for private use. The decision, of course, must be read with reference to the facts under consideration, for the principle on which it proceeds was no broader than the situation to which it was given application, and when it is recalled that the principle was announced in connection with a case where the relator could take the property sought and without even generating any electricity use the same at its own will for any purpose to suit its convenience, it will be seen to announce a rule that is not only not antagonistic to the later decision of the United States supreme court, but one that must find ready accord from the courts of every jurisdiction.

Since that decision, there has come about in the state of Washington a situation which the eminent writer thereof undoubtedly had in mind in the concluding paragraph where it was said:

"We do not mean to say that the right of eminent domain can, in no case, be extended to a corporation organized for the purpose of generating and transmit-

ting electricity for power and other purposes.   But before this can be done, public necessity must require it, and the right of the public to the use and enjoyment of the property must be regulated, guaranteed and safeguarded by proper legislation.''

This state has, by statute, since that time, created a public service commission with a duty upon it of regulating the service given and rates charged by such companies as the relator, and it has submitted itself to that jurisdiction   The rights of the public to the use and enjoyment of its electric power are, therefore, regulated, guaranteed and safe-guarded by proper legislation, and public necessity requires that in fulfilling the duties it owes to the public generally it be granted the right of eminent domain.

The state possesses what has often been said upon reliable authority to be one-sixth of the total water power of the United States.   Since the unfettered and untrammeled development thereof to the end that the public may be served in the manifold ways it requires is a thing much to be desired, and when this can be accomplished through public control and regulation, the conclusion seems ineluctable that no decision of this court should stand in the way.   The vanguard of progress moves steadily onward.   Of twenty-eight states that have had a similar question presented, some twenty-four have upheld the right of eminent domain as sought to be enforced here, and of the remaining four, the facts were sufficiently distinguishable to make them hardly authority for the contrary view.   An instance of this is found in *Smith v. Western Maine Power Co.*, 125 Me. 238, 132 Atl. 740, where the Maine court permitted the exercise of the power of eminent domain by a power company where the condemnor was authorized by its charter to furnish electricity for manufacturing as well as lighting and heating pur-

poses.   Although not passing upon the question as to whether the use for manufacturing was a public use, it distinguished *Brown v. Gerald,* 100 Me. 351, 61 Atl. 785, cited and relied upon in *State ex rel. Harris v. Superior Court, supra,* by pointing out that in that particular case the electric energy was all to be used by a single plant and therefore the probability of public use was too remote.

It is also contended that the relator has no right to use the power of eminent domain because all the electric energy produced therefrom will be sold in Idaho. Whether the right of eminent domain can be used in one state to acquire electric energy to be sold wholly or in part without that state, we do not need to here inquire, as the trial court made a finding that none of the energy so produced would flow into Idaho.   An examination of the record does not lead to a different conclusion.

Two other questions are urged by respondents: (a) that the court did not acquire jurisdiction; and (b) that the notice was insufficient.

[2]   As to the first, it was urged that, since the notice to respondents did not run in the name of the state of Washington, and that by art. IV, § 27 of the state constitution, all process is required to be in the name of the state of Washington, the notice was ineffectual to give jurisdiction.   An elaborate argument on this point is pressed upon us to show that the notice herein is process within the meaning of the constitution.   But we think it unnecessary to enter into a review of the question, since we have heretofore held that a summons in a civil action is not process; and we think the notice given herein stands on no higher plane.   *Wagnitz v. Ritter,* 31 Wash. 343, 71 Pac. 1035; *Spokane Merchants Ass'n. v. Acord,* 99 Wash. 674, 170 Pac. 329, 6 A. L. R.

835; *State ex rel. Hagen v. Superior Court,* 139 Wash. 454, 247 Pac. 942.

[3]   The second contention that the description of the property sought to be condemned is insufficient was raised in the trial court at appropriate times by objection to the jurisdiction, and also through motions to make more definite and certain.   An investigation of the notice shows the property is described by courses technical in their wording, and evidently prepared by a civil engineer versed in such matters.   They may not be as full and sufficient as respondents desire, but we think them not so insufficient as to deprive the court of jurisdiction.   Whatever defects they contain can well be cured upon demand.   The trial court did not pass upon the motion to make more definite and certain, and deferred ruling thereon.   We must assume that it will grant the motion, if the showing requires it.

The judgment of the trial court is reversed, with instructions to proceed in accordance with this opinion.

All concur.