[No. 44131.    En Banc.    November 18, 1976.]

THE HOUSING AUTHORITY OF KING COUNTY, *Respondent*, v.
FRANCES SAYLORS, *Petitioner*.

*Stephen Quesenberry, Barbara Isenhour,* and *James Fearn, Jr.,* of *Legal Services Center* (Seattle), for petitioner.

*R. George Ferrer* and *L. O. Hurst* (of *Montgomery, Purdue, Blankinship & Austin*), for respondent.

*Croil Anderson* on behalf of Seattle-King County Bar Association, amicus curiae.

ROSELLINI, J.—This case is before the court upon a motion for an order of indigency and for the expenditure of public funds to pay the costs of prosecuting an appeal from a judgment in favor of the petitioner's landlord in an unlawful detainer action.

From the facts alleged in the briefs, it appears that the King County Housing Authority, a municipal corporation which provides subsidized housing to families of low income, determined that it would be necessary to terminate the petitioner's tenancy. She was served with a notice advising her that she would be terminated because she was maintaining a nuisance on the property. (The nature of the nuisance is not revealed.)

To challenge the proposed eviction, the petitioner, with the assistance of the Seattle Legal Services Center, pursued the administrative remedy which was provided in her lease in accordance with federal regulations. This included a conference with a management representative and a hearing before a panel composed of three fellow tenants. She was represented by counsel on both occasions. The hearing was conducted in accordance with regulations promulgated by the Department of Housing and Urban Development. At such a hearing either party may cause a record to be made. None was made in this case. After the hearing, the panel issued a written decision sustaining the Housing Authority's determination that there was cause for eviction of the petitioner.

The petitioner refused to vacate the premises after re-

ceipt of a copy of the decision. The Housing Authority then filed this unlawful detainer action. The petitioner, conceding that there had been a hearing as required in the lease, and that the hearing panel had found that cause for eviction was proven, nevertheless contended that the Housing Authority was required by law to prove, by evidence offered in court, that such cause existed. The Superior Court ruled that the admissions of the petitioner showed that the Housing Authority was entitled to the relief sought in the unlawful detainer action and entered judgment accordingly.

The petitioner filed notice of appeal and now seeks an order for the expenditure of public funds to finance it. She relies upon the case of *Carter v. University of Washington*, 85 Wn.2d 391, 536 P.2d 618 (1975), in which a plurality of this court held that, in a civil as well as in a criminal action, an indigent has a constitutional right to appeal without payment of the court's filing fee or without providing the cost bond required under ROA I-22.[1] We are asked to reconsider that plurality holding, it being urged by the respondents that it was in error, without foundation in law, and contrary to public policy.

Before examining that opinion, we will review briefly the civil cases involving indigents which have come before this court in recent years, noting also relevant decisions of the Supreme Court of the United States.

The first of these was *O'Connor v. Matzdorff*, 76 Wn.2d 589, 458 P.2d 154 (1969), wherein we held that the courts of this state have the inherent power to waive the payment of filing fees (whether these fees are imposed by court rule or by statute) if justice demands it, and upon a showing that the action is brought in good faith and has probable merit.

In determining that this inherent power exists in justice courts as well as in the higher courts, we surmised that a substantial number of the claims of the poor, if indeed not

[1] The bond protects the respondent's right to costs which is provided for in RCW 4.88.

a majority of them, fall within the justice court jurisdiction.

Subsequent to our decision in *O'Connor v. Matzdorff*, *supra*, the United States Supreme Court decided *Boddie v. Connecticut*, 401 U.S. 371, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971). It held that due process of law requires that, where a state has preempted the right to dissolve the marriage relationship, it cannot place a barrier of court filing fees before an indigent seeking a divorce.

In *Ashley v. Superior Court*, 83 Wn.2d 630, 521 P.2d 711 (1974), a divorce action, filing fees had been waived, pursuant to *O'Connor v. Matzdorff*, *supra*, and there came before the court the question whether the indigent plaintiff was required to pay the expenses of publication and service of the summons and complaint. In a plurality opinion, we observed that the court had no power to waive the defendant's constitutional right to notice, but fashioned a means of giving notice which was appropriate in the circumstances and which made it unnecessary for the plaintiff to incur the expenses of publication and sheriff's service. Inherent in that opinion was a recognition that the court did not have the power to waive the sheriff's fees, which are provided for by statute, or to waive on behalf of a newspaper the costs of publication.

*Ashley v. Superior Court*, *supra*, was followed in *Bullock v. Superior Court*, 84 Wn.2d 101, 524 P.2d 385 (1974), where we again refused to order the waiver of sheriff's fees, and instead directed the trial court to devise an alternative means of service.

It will be noted that both of these cases were divorce cases and therefore came within the rule laid down in *Boddie v. Connecticut*, *supra*, that filing fees may not be required of indigents who seek dissolution of their marriages, control of such dissolution having been preempted by the state.

Following *Boddie v. Connecticut*, *supra*, the United States Supreme Court decided *United States v. Kras*, 409 U.S. 434, 34 L. Ed. 2d 626, 93 S. Ct. 631 (1973), in which it

held that there is no constitutional right to free access to the bankruptcy courts, there being other avenues of relief available to a bankrupt, the right to a discharge in bankruptcy being neither a constitutional nor a "fundamental" right (which demands a compelling governmental interest as a precondition to regulation), and there being a rational basis for a fee requirement.

That court also decided *Ortwein v. Schwab*, 410 U.S. 656, 35 L. Ed. 2d 572, 93 S. Ct. 1172 (1973), a case involving an Oregon statute which required a $25 filing fee in connection with applications made to the appellate courts to obtain review of agency decisions lowering welfare payments. The court determined that the indigent in those circumstances had no constitutional right to appeal without payment of the fee. It said that an interest in increased welfare payments does not have the constitutional significance of the interest that one has in dissolving his marriage and that the appellants had received an agency hearing, not conditioned on the payment of a fee, which was an adequate remedy. It stated that it had long recognized that, even in criminal cases, due process does not require a state to provide an appellate system.

In answer to a contention that the filing fee violated the equal protection clause by unconstitutionally discriminating against the poor, the court said that where the litigation is "in the area of economics and social welfare" and does not involve any suspect classification, such as race, nationality, or alienage, the applicable standard is that of rational justification. The filing fee was rationally justified, as it was not disproportionate and provided some revenue to assist in offsetting the operating expenses of the court.

The rationale of the *Kras* and *Ortwein* decisions was followed by the Court of Appeals, Division One, in *Bowman v. Waldt*, 9 Wn. App. 562, 513 P.2d 559 (1973), where it was urged that an indigent suitor who had recovered a $50 judgment was entitled to execution of the judgment without payment of the sheriff's fee and indemnity bond. Noting the similarity between the due process and equal

protection clauses of U.S. Const. amend. 14 and Const. art, 1, §§ 3, 12 (citing *Olsen v. Delmore*, 48 Wn.2d 545, 295 P.2d 324 (1956), and *Herr v. Schwager*, 145 Wash. 101, 258 P. 1039 (1927)), the court held that the appellant had no constitutional right to a waiver of the fees. It further held that the lower court did not abuse its discretion in refusing to waive the fees, finding the appellant's interest in obtaining execution upon his judgment was outweighed by the sheriff's statutory right to indemnification.

*Ortwein* and *Kras* were also relied upon by the Court of Appeals, Division Three, in *Malott v. Randall*, 11 Wn. App. 433, 523 P.2d 439 (1974). The court there refused to order a waiver of the requirement of RCW 23A.08.460, that security be posted in a shareholder's derivative action.

In *Iverson v. Marine Bancorporation*, 83 Wn.2d 163, 517 P.2d 197 (1973), where a successful plaintiff appealed, claiming the judgment was inadequate, this court waived its fees (pursuant to ROA I-10(a) (1) (iii)), and in addition ordered the preparation of a free transcript and statement of facts and the waiver of the cost bond. It was not decided that these measures were constitutionally required; rather the decision was rested on the inherent power doctrine first recognized in *O'Connor v. Matzdorff, supra*. Justice Hale, dissenting, drew attention to the fact that there was neither a statutory nor a constitutional justification for waiver of a payment due a third party such as a court reporter and that *O'Connor v. Matzdorff, supra*, went no further than to find an inherent power in the court to waive its own filing fees.[2]

Against the background of these cases, we turn to *Carter v. University of Washington*, 85 Wn.2d 391, 536 P.2d 618 (1975). The appellant in that case was a civil service employee of the university's trucking service. His employment having been terminated because of his alleged violation of state and institutional regulations, he sought and was

---

[2]When this case came before the court on the merits, it was found that the appeal was without substance. *Iverson v. Marine Bancorporation*, 86 Wn.2d 562, 546 P.2d 454 (1976)..

granted review by the Higher Education Personnel Board, which upheld the termination. The superior court affirmed the board, and the appellant petitioned this court for leave to appeal in forma pauperis. Five judges agreed that the fees and appeal bond should be waived if the appellant was a bona fide indigent and if the appeal had probable merit. No showing of probable merit or indigency having been made in the original petition, the matter was remanded to the superior court to determine these questions.

The superior court's evaluation was somewhat ambiguous, owing to its understandable reluctance to pass judgment upon its own prior disposition of the case. Nevertheless, when the case again came before this court, we were able to determine from the superior court's findings that there was no probable merit to the appeal. The application to proceed in forma pauperis was denied. *Carter v. University of Washington*, 87 Wn.2d 483, 554 P.2d 338 (1976).

The plurality opinion in the first *Carter* case was rested upon two grounds—the inherent power of the court (citing *O'Connor v. Matzdorff*, 76 Wn.2d 589, 458 P.2d 154 (1969)), and a constitutional right to appeal all meritorious cases, found either in article 1, section 12, or article 1, section 4 of the state constitution.

Const. art. 1, § 12, provides:

No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.

In determining that this provision requires that an indigent having an apparently meritorious case be allowed to prosecute his appeal without payment of such expenses as filing fees and cost bond premiums, signers of the opinion chose not to follow the United States Supreme Court's interpretation of the fourteenth amendment to the United States Constitution.

■■ We have said that, because of their similar wording and similar purposes, the equal protection clause of the federal constitution and the privileges and immunities

clause of the state constitution are substantially identical in their impact upon state legislation. *Hanson v. Hutt*, 83 Wn.2d 195, 517 P.2d 599 (1973); *State v. Perrigoue*, 81 Wn.2d 640, 503 P.2d 1063 (1972). Where language of our state constitution is similar to that of the federal constitution, we have held that the language of the state constitutional provision should receive the same definition and interpretation as that which has been given to the federal provision by the United States Supreme Court. *State v. Moore*, 79 Wn.2d 51, 483 P.2d 630 (1971); *State v. Schoel*, 54 Wn.2d 388, 341 P.2d 481 (1959).

■ The United States Supreme Court, construing the Fourteenth Amendment, has held that it does not require a waiver of court fees for indigents, if the interest involved in the indigent's claim is not a fundamental one and there is another procedure available, not requiring the payment of fees, through which redress can be sought. If the litigation is in the field of economics and social welfare, and there is no suspect classification, the applicable standard for determining the propriety of imposing fees is rational justification. *Ortwein v. Schwab*, 410 U.S. 656, 35 L. Ed. 2d 572, 93 S. Ct. 1172 (1973).

The court did not hold that economics and social welfare is the only field in which fundamental interests are not involved. What interests other than the marital status require free access to the judicial process is a question which remains for future determination. But in any event, in both the *Carter* case and this case, the interest involved lies in the area of economics and social welfare. In both cases, all of the designated considerations are present. As the United States Supreme Court said in *Ortwein v. Schwab*, *supra*, the rational justification test is met if the fee is not disproportionate and provides some revenue to assist in offsetting operating costs.

In refusing to accept the United States Supreme Court's interpretation of constitutional requirements of equal protection, the signers of the plurality opinion did not rest their decision upon any significant difference in the lan-

guage of article 1, section 12.[3] Rather the opinion purports to give effect to an assumed state public policy, more generous to the poor than is that of the nation as a whole, which was read into the constitution, but without reference to any specific language.

The difficulty with this approach is that public policy is a matter to be determined by the people, speaking either through their constitution or the legislature. In their constitution, the people adopted one provision which is addressed to a problem of the poor. It provided in article 1, section 17, that there shall be no imprisonment for debt except in the case of absconding debtors. Aside from the implied right to free defense which has been found to exist in criminal cases, the alleviation of other problems occasioned by economic distress was left to the discretion of the legislature. That body has provided for the payment of the costs of the transcript and all costs necessarily incident to a proper consideration of a review, where it has been judicially determined that a party has a constitutional right to review and that he is unable by reason of poverty to procure counsel to perfect the review. RCW 2.32.240, RCW 4.88.330. In concluding that the policy of this state dictates that indigents must have free access to the courts in all civil cases having apparent merit, the plurality opinion in *Carter v. University of Washington*, 85 Wn.2d 391, 536 P.2d 618 (1975), improperly invaded the legislative province.

That there is a distinction between the rights of a criminal defendant and those of a party to a civil suit cannot be overlooked.

■ The constitution itself expressly gives a right of appeal in all criminal cases. Const. art. 1, § 22. Since the framers are shown to have had in mind the question of the right to appeal, and granted it only in criminal cases, their silence with respect to civil cases cannot reasonably be interpreted as the expression of an intent that appeals

---

[3]It would appear that Const. art. 1, § 12, is less liberal than U.S. Const. amend. 14, if a distinction between the two is to be found in the language used, for it expressly authorizes the legislature to impose terms upon the enjoyment of a privilege.

should be allowed in all or in any particular category of such cases.

The right of appeal in civil cases, then, if it exists, is one which is granted by the legislature. Where express legislation is not involved, this court exercises a large degree of discretion in determining what cases are appealable. The rules of this court providing for appeals speak in terms of permission and not of right. ROA I-14 through -16.

The appellate courts of the state provide a service for dispute settlement. Like other state services, when they are utilized by private individuals it is not unreasonable to require that some of the cost be borne by those receiving such special benefits. Because of the cost of preparing records, legal services, and briefs—costs which are not imposed by the state or by the court but rather are charges made by other private citizens pursuing their own means of livelihood—the appellate process is expensive. We can safely surmise that many litigants who are not to be classified as indigent are still not affluent enough to afford the luxury of an appeal.

Whether the public interest requires that the appellate process be more extensively utilized, and whether the public is willing to finance a greater utilization of it, is a question to be resolved by the legislature. It is certain that this court cannot provide for the financing of appeals in every case of probable merit where the appellant is not able to afford the expense of further litigation, absent a legislative appropriation.

We conclude that the departure in *Carter v. University of Washington, supra,* from the general rule that this court will be governed by decisions of the United States Supreme Court interpreting similar constitutional provisions was ill-advised and should be rejected, and that the privileges and immunities clause does not require that appellate fees be waived in cases such as these, where all of the factors set forth in *Ortwein v. Schwab, supra,* and specified above, are present.

■ *Carter v. University of Washington, supra,* should

also be overruled insofar as it suggested that article 1, section 4, protects a right of access to the courts. This section reads: "The right of petition and of the people peaceably to assemble for the common good shall never be abridged." This provision obviously has reference to the exercise of political rights. The language of the constitution, like that of statutes, is to be given its common and ordinary meaning. It requires an awkward and unnatural construction of this language to make it applicable to the judicial process. Access to the courts is amply and expressly protected by other provisions.

■ We are not shown, however, that we were in error when we held in *O'Connor v. Matzdorff*, 76 Wn.2d 589, 458 P.2d 154 (1969), that the courts retain an inherent power to waive their own fees in order to consider a case where it is made to appear that justice requires it. The question whether the waiver of court reporter's fees in *Iverson v. Marine Bancorporation*, 83 Wn.2d 163, 517 P.2d 197 (1973), and the statutory cost bond in both *Iverson* and *Carter* was a proper exercise of the court's inherent power need not be decided at this time.[4]

In determining whether the court should exercise its inherent power and waive its fees in order to facilitate an appeal in a given case, we must always keep in mind that there is no constitutional right to appeal a civil case, that it is presumed that the court below proceeded according to law and reached a correct decision, and that the burden is upon the appellant to show error.

That these presumptions are justified is shown by this court's experience with respect to reversals, which are always substantially exceeded by affirmances.[5]

For these reasons the legislature has provided the extra

[4]It is worthy of note that the California courts, whose practice this court regarded as persuasive in *O'Connor v. Matzdorff*, 76 Wn.2d 589, 458 P.2d 154 (1969), waive only the filing fees on civil appeals, according to advice received from the California Judicial Council.

[5]In 1975, for example, 59 percent of the opinions filed affirmed the superior court. Where a petition for review was granted, the percentage of affirmances of the superior court was 79.

protection of a cost bond for the respondent, whose victory in the lower court was presumably justified. A respondent faced by an indigent appellant is at an added practical disadvantage, since there is little hope that he can be made whole if the appellant does not prevail. Caution must be exercised, therefore, and we must carefully examine any application for waiver of fees to make certain that the risks to the respondent are minimized.

It is significant that of the four indigency cases which have been before this court which did not meet the "fundamental interest" test set forth in *Boddie v. Connecticut*, 401 U.S. 371, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971), none has involved a miscarriage of justice. Lack of merit has been specifically found in *Iverson v. Marine Bancorporation*, 86 Wn.2d 562, 546 P.2d 454 (1976), and *Carter v. University of Washington*, 87 Wn.2d 483, 554 P.2d 338 (1976), and the present case. *O'Connor v. Matzdorff, supra*, we are advised, was never pursued in justice court after this court remanded it.

■ The method provided in *Carter* for determining whether the factors of indigency, good faith, and meritorious claim are present, upon further consideration, appears to involve an unnecessary procedural step. Since, as the superior court's order in that case made clear, a judge whose decision is questioned on review is placed in an uncomfortable position if asked to pass upon the merits of that review, we have concluded that the remand for such consideration is not a practical method of ascertaining the probable merit of the appeal. A reasonably accurate determination should be possible if the petitioner is required to submit his attorney's affidavit of his indigency and his good faith and is further required to allege facts in his petition and cite applicable legal principles which will show there has been a miscarriage of justice and that his appeal is well taken.

Under 28 U.S.C. § 1915, enacted in 1892, the right to proceed must be established by affidavits. *Cf.*, Rules of the Supreme Court, 1883, Order XVI, No. 24, adopted pursuant

to 11 Hen. 7, c. 12 (1495), which required an affidavit of "all the material facts." 9 *Chitty's English Statutes* 723-24 (6th ed., W. Aggs 1912).

Such a showing has not been made in this case. The petitioner concedes that she was given the hearing upon the question of good cause for eviction which was required by law, that such cause was found to exist, and that she was given the statutory notice to vacate the premises. She does not deny that there was in fact good cause for eviction. There is, in short, no allegation before us which would justify a conclusion that an injustice has been done. The motion to proceed in forma pauperis is therefore denied.

STAFFORD, C.J., and HUNTER, HAMILTON, WRIGHT, BRACHTENBACH, and DOLLIVER, JJ., concur.

HOROWITZ, J. (concurring in the result)—Prior to *Carter v. University of Washington*, 85 Wn.2d 391, 536 P.2d 618 (1975) *(Carter 1)*, this court, conformable to common-law tradition, recognized it had the power to enable an indigent to prosecute an appeal from a judgment involving a civil claim of probable merit brought by him in good faith by waiving payment of court filing fees, excusing the posting of an appeal bond, and making provision for a free transcript and statement of facts. *Iverson v. Marine Bancorporation*, 83 Wn.2d 163, 517 P.2d 197 (1973). *See also Ashley v. Superior Court*, 83 Wn.2d 630, 521 P.2d 711 (1974); *Bullock v. Superior Court*, 84 Wn.2d 101, 524 P.2d 385 (1974).

*Iverson v. Marine Bancorporation, supra* at 167, states the underlying theory clearly:

Const. art. 4, § 1 and § 30, vests the judicial power in the Supreme Court, Court of Appeals and superior courts of this state. Upon creation, these courts assumed certain powers and duties. *See O'Connor v. Matzdorff* [76 Wn.2d 589, 458 P.2d 154 (1969)], and *In re Bruen*, 102 Wash. 472, 172 P. 1152 (1918). These duties include, among others, the fair and impartial administration of justice and the duty to see that justice is done in the cases that come before the court. The administration of justice demands that the doors of the judicial system be open to the

indigent as well as to those who can afford to pay the costs of pursuing judicial relief. *O'Connor v. Matzdorff, supra.*

In the *O'Connor* case we stated on page 605:

. . .
The proper and impartial administration of justice requires that these doors be kept open to the poor as well as to those who can afford to pay the statutory fees.

A difficulty faced by the court in exercising the power described was the lack of appropriated funds with which to fund a court order intended to enable an indigent to prosecute his appeal. Thus the court had no funds with which to pay a court reporter to furnish a statement of facts needed for the indigent's appeal. It accordingly authorized him to file a claim with the legislature for reimbursement. In that same case, to enable a prevailing defendant to collect his taxable costs when the appeal bond was excused, the court imposed a lien on the fruits of the indigent's litigation. If, however, the defendant prevailed so that no fruits of the litigation existed, he was authorized to file a claim for reimbursement with the legislature up to the amount of the appeal bond. *Iverson v. Marine Bancorporation, supra* at 168. The court explained:

[T]he fact that funds are not available cannot prevent this court from performing its duty of administering fair and impartial justice to all regardless of economic status.

*Iverson v. Marine Bancorporation, supra* at 168.

The difficulty with the court's solution of the problem of lack of funds was that it unfairly placed the burden of paying or seeking reimbursement for appeal expenses upon the individual who himself owed no duty to protect an indigent's access to the courts rather than upon the state whose duty it was to provide for the peaceful settlement of disputes in a manner conformable to justice under law.

*Carter 1* charted a new course that would better protect an indigent's right of court access to pursue a civil claim of probable merit. It substituted for the notion of court discretion to permit court access on appeal the principle that the

state was constitutionally required to grant court access "to all regardless of economic status." *Iverson v. Marine Bancorporation, supra* at 168. The right of court access for purposes of appeal was part of the general right of court access. Construing article 1, sections 4 and 12 of our state constitution, it held an indigent's access to the courts is itself a fundamental interest or right properly protected by law; that the legitimacy of legislative classification abridging the right of court access was to be determined under article 1, section 12, so that only a compelling state interest would justify any such abridgement; that "classifications based on wealth are indeed dubious"; and that there is not "a compelling state interest that justifies opening the gates of the judicial system to the affluent but closing them to the poor." *Carter v. University of Washington, supra* at 399, 401.

*Carter 1* further held that *Boddie v. Connecticut*, 401 U.S. 371, 28 L. Ed. 2d 113, 91 S. Ct. 789 (1971); *United States v. Kras*, 409 U.S. 434, 34 L. Ed. 2d 626, 93 S. Ct. 631 (1973) and *Ortwein v. Schwab*, 410 U.S. 656, 35 L. Ed. 2d 572, 93 S. Ct. 1172 (1973); construing the Fourteenth Amendment, unduly clouded or restricted the general right of court access. *Carter 1* declined to limit such right to possible restrictions described in *Boddie, Kras*, and *Schwab*, namely such a right would be recognized only if the indigent's claim involved a fundamental interest within the exclusive power of the courts to protect and then only if the indigent's claim did not involve "economics or social welfare." Under *Carter 1* the right of court access in a civil case was itself a fundamental right and the right did not depend on its subject matter. The only requirements were indigency and a good faith claim of probable merit.

The judges in *Boddie, Kras*, and *Schwab* did not all agree upon the proper rationale to be used to dispose of those cases. Several of the judges tended to favor recognizing an indigent's broad, rather than a limited, subject matter right of access to the courts in civil cases.

Justice Black, who dissented in *Boddie* because he be-

lieved himself controlled by a prior analogous decision of the Supreme Court, later pointed out:

[I]f the decision [*Boddie*] is to continue to be the law, it cannot and should not be restricted to persons seeking a divorce. It is bound to be expanded to all civil cases. Persons seeking a divorce are no different from other members of society who must resort to the judicial process for resolution of their disputes.

*Meltzer v. C. Buck LeCraw & Co.*, 402 U.S. 954, n.1, 29 L. Ed. 2d 124, 91 S. Ct. 1624 (1971).

In my view, the decision in *Boddie v. Connecticut* can safely rest on only one crucial foundation—that the civil courts of the United States and each of the States belong to the people of this country and that no person can be denied access to those courts, either for a trial or an appeal, because he cannot pay a fee, finance a bond, risk a penalty, or afford to hire an attorney. . . . I believe there can be no doubt that this country can afford to provide court costs and lawyers to Americans who are now barred by their poverty from resort to the law for resolution of their disputes.

*Meltzer v. C. Buck LeCraw & Co.*, *supra* at 955-56.

The new rationale of *Carter 1* brought quick results. Promptly after *Carter 1* the Washington legislature responded by making provision for the funding of the constitutional right of appeal by indigents as described in that case. RCW 4.88.330 (Laws of 1975, 1st Ex. Sess., ch. 261, § 2, p. 868) provides:

When a party has been judicially determined to have a constitutional right to obtain a review and to be unable by reason of poverty to procure counsel to perfect the review all costs necessarily incident to the proper consideration of the review including preparation of the record, reasonable fees for court appointed counsel to be determined by the supreme court, and actual travel expenses of counsel for appearance in the supreme court or court of appeals, shall be paid by the state.

Later this court itself adopted rule 15.2 of the Rules of Appellate Procedure (RAP), effective July 1, 1976, dealing

with indigency and the rights of an injured party. RAP 15.2(c) reads in part:

> If the Supreme Court determines that the party is seeking review in good faith, that an issue of probable merit is presented, and that the party is entitled under the state or federal constitution to review partially or wholly at public expense, the Supreme Court will enter an order directing the trial court to enter an order of indigency. In all other cases, the Supreme Court will enter an order denying the party's motion for an order of indigency.

The statute and court rule went far to solve the difficult financial problem faced in *Iverson* and in *O'Connor v. Matzdorff*, 76 Wn.2d 589, 458 P.2d 154 (1969) by funding the constitutional right of appeal. Such funding obviated the necessity of using the prior make-do methods to obtain funds to enable the court orders to be carried out.

In the instant case, the majority, in a very substantial respect overrules *Carter 1*, so recently decided, by severely limiting the subject matter of that right. Such action requires sound supporting arguments. *See* Topinka, *Overruling Prior Decisional Rules in the New Hampshire Supreme Court*, 14-16 N.H. B.J. 273 (1972-75). Let us consider those advanced.

First, we deal with a problem potentially facing an important segment of our state population. We know of no reliable survey of how many claims of probable merit by indigents are involved. We do have some figures on the number of indigents in this state. If, for. example, we limit consideration to those on public assistance as indigent (there are others as well), the available figures show the numbers are substantial. In fiscal 1975 the total number of public assistance recipients in all 39 counties of this state was 216,438 out of the then total state population of 3,214,000 (*see State of Washington Pocket Data Book 1975*, at 250). Persons on public assistance were found in all 39 counties of the state. Twenty-three of those counties, including Yakima, Pierce, Spokane, and King counties had an above-average public assistance population.[6]

---

[6]"The number of poor persons increased by 2.5 million or 10.7

People on public assistance cannot afford the expense of litigation. They cannot even afford to employ an attorney to seek discretionary relief from this court because they must first show, by an "attorney's affidavit of his indigency and his good faith and [must] allege facts in his petition and . . . applicable legal principles which will show there has been a miscarriage of justice and that his appeal is well taken." Majority opinion at page 743.

Second, overruling *Carter 1* is entirely unnecessary to enable this court to dispose of petitioner's motion. The majority holds there has been no showing of probable merit as required by *O'Connor v. Matzdorff, supra,* and its progeny to warrant this court granting the motion. Even *Carter 1* recognizes the constitutional right of an indigent to have access to the courts in civil cases, including the right of appeal, is subject to the requirement that the indigent's claim have probable merit. Accordingly, even if *Carter 1* were not overruled, petitioner's motion would still be denied for want of probable merit.

Third, the majority, by its action on *Carter 1*, has deprived this court of the opportunity otherwise afforded by *Carter 1* to fund nearly all of its orders permitting the expenditure of public funds to prosecute an appeal in a civil case of probable merit. RCW 4.88.330 and RAP 15.2(c) fund only the "constitutional" rights of appeal. They do not fund orders to expend public funds no matter how properly entered in the exercise of discretionary power pursuant to

percent between 1974 and 1975. This was the largest single year increase observed since 1959, the first year for which poverty data were available. In 1975, there were 25.9 million persons below the poverty level, comprising 12 percent of all persons. The increase in the number of poor between 1974 and 1975 was quite pervasive, occurring for both Black and White persons, for persons of Spanish origin, and for the young as well as for the elderly." *Money Income and Poverty Status of Families and Persons in the United States: 1975 and 1974 Revisions* (Advance Report) 2 (U.S. Department of Commerce Bureau of the Census, Series P-60, No. 103, 1976). *See also* Rosenberg, *The Great Lawyer Surplus and Legal Services to the Poor,* Vol. 30, No. 9, Washington State Bar News (Sept. 1976).

*Iverson v. Marine Bancorporation*, 83 Wn.2d 163, 517 P.2d 197 (1973) and *O'Connor*.

The majority argues the right of access to courts in a civil case by indigents to prosecute a claim of probable merit is a public policy matter to be determined by the people speaking through their constitution or their legislature. No doubt the legislature has power to enact statutes expressive of public policy. However, statutes are subject to the state constitution and the latter's interpretation is historically a judicial function which the state constitution vests in the judiciary rather than in the legislature.

Moreover, in the exercise of its judicial power to interpret general clauses in our constitution, the court may properly take into account relevant public policy considerations in order to give specific content to these general clauses. These general clauses include those relating to the right to petition for redress of grievances (Const. art. 1, § 4), the due process clause (Const. art. 1, § 3), and the State's version of equal protection clause (Const. art. 1, § 12). *See generally* J. Day, *Why Judges Must Make Law*, 26 Case W. Res. L. Rev. 563, 574 (1976).

The sources of information concerning public policy and its content are not limited to legislative enactment or expression. Public policy may be found from various sources —the same sources indeed on which the legislature itself may rely in determining public policy. Ultimately such policy comes from the people, and the basic framework of our government, including the Bill of Rights in our state constitution and the institutions that people have created.

Where the constitution, including its Bill of Rights, is used as a source of public policy, that constitution is not to be read in narrow and grudging fashion. It is to be read in a manner that will give it full force and effect to carry out its purposes in light of contemporary needs.

In *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 442, 78 L. Ed. 413, 54 S. Ct. 231, 88 A.L.R. 1481 (1933), the court said:

It is no answer to say that this public need was not

apprehended a century ago, or to insist that what the provision of the Constitution meant to the vision of that day it must mean to the vision of our time. If by the statement that what the Constitution meant at the time of its adoption it means to-day, it is intended to say that the great clauses of the Constitution must be confined to the interpretation which the framers, with the conditions and outlook of their time, would have placed upon them, the statement carries its own refutation. It was to guard against such a narrow conception that Chief Justice Marshall uttered the memorable warning—"We must never forget that it is *a constitution* we are expounding" (*McCulloch* v. *Maryland*, 4 Wheat. 316, 407)—"a constitution intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs." *Id.*, p. 415. When we are dealing with the words of the Constitution, said this Court in *Missouri* v. *Holland*, 252 U.S. 416, 433, "we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. . . . The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago."

Judge R. Traynor, then associate justice of the Supreme Court of California, in *Some Open Questions on the Work of State Appellate Courts*, 24 U. of Chi. L. Rev. 211, 219 (1957) has this to say:

The responsibility to keep the law straight is a high one. It should not be reduced to the mean task of keeping it straight and narrow. We should not be misled by the cliché that policy is a matter for the legislature and not for the courts. There is always an area not covered by legislation in which the courts must revise old rules or formulate new ones, and in that process policy is often an appropriate and even a basic consideration.

W. Hornblower, *A Century of "Judge-Made" Law*, 7 Colum. L. Rev. 453 (1907), had this to say:

It is hard for us, of this bustling, hustling twentieth century, to realize the state of society at the beginning of the last century when there were no such things known as railroads, telegraphs or steamboats, not to speak of telephones, sewing machines, typewriters, phonographs, bicycles, automobiles and trolley cars. Innumerable

questions have arisen for adjudication by the Courts during the past century, which, to the lawyers and judges of the previous century, would have been absolutely unintelligible for the reason that the phrases used by witnesses and counsel would have represented to their minds no existing state of facts, or no possible or conceivable state of facts.

A vast body of jurisprudence has been built up to meet these new and unexpected conditions of society. This body of jurisprudence has been built upon the foundations laid by our ancestors, and has been the work of the judges and the lawyers, aided or interfered with only occasionally by statutory provisions.

Our state constitution has entrusted to the judiciary the ultimate responsibility for the peaceful adjudication of controversies in a spirit of fairness and justice. This responsibility necessarily requires courts not ignore the impact of a public policy relevant to the disposition of a case then pending before the court by waiting for the legislature to first announce or enact statutes from which that policy may be ascertained. The fact is, the policy may well have been there long before the legislature got around to recognizing it. In the past this court has overruled a prior decision because of changes in public policy or what amounts to public policy without waiting for the legislature to first adopt legislation changing the rule of the decisions involved.[7] Furthermore, this court has itself recognized the constitutional right to counsel in certain cases characterized as civil in character without waiting for prior legislative action recognizing or providing for such right.[8]

---

[7] *Taskett v. KING Broadcasting Co.*, 86 Wn.2d 439, 546 P.2d 81 (1976); *Lyons v. Redding Constr. Co.*, 83 Wn.2d 86, 515 P.2d 821 (1973); *Friend v. Cove Methodist Church, Inc.*, 65 Wn.2d 174, 396 P.2d 546 (1964); *Potts v. Amis*, 62 Wn.2d 777, 384 P.2d 825 (1963); *Siragusa v. Swedish Hosp.*, 60 Wn.2d 310, 373 P.2d 767 (1962); *State ex rel. Chelan Elec. Co. v. Superior Court*, 142 Wash. 270, 253 P. 115, 58 A.L.R. 779 (1927); *Christianson v. Fayette R. Plumb, Inc.*, 7 Wn. App. 309, 499 P.2d 72 (1972). *See Tully v. State*, 4 Wn. App. 720, 723 n.2, 483 P.2d 1268 (1971); *Hunter v. North Mason High School*, 85 Wn.2d 810, 539 P.2d 845 (1975).

[8] *In re Myricks*, 85 Wn.2d 252, 533 P.2d 841 (1975) (indigent's right of counsel required in dependency and temporary deprivation hearings

We are not here dealing with the recognition of a public policy contrary to one enacted by the legislature. We are dealing with the recognition of a public policy in the absence of a prior formal legislative recognition of that policy —a policy then promptly recognized pro tanto by the enactment of RCW 4.88.330. That policy conforms to the constitution as construed by the judicial branch of government in *Carter 1. Boddie v. Connecticut*, 401 U.S. 371, 28 L. Ed. 2d 113, 91 S. Ct. 789 (1971) is an example of a public policy adopted without waiting for Congress to first enact such a policy.

The public policy adopted which is the basis of *Carter 1*'s interpretation of our state constitution is a recognition of the State's duty to provide order, and to that end provide a forum for the peaceful settlement of disputes by applying the principles of justice under law. This duty requires a forum for all disputes of a legal nature—not a forum for only some disputes. To exclude disputes involving economics and welfare and to then further limit disputes to be resolved by courts to those involving a fundamental interest which courts have the exclusive means to enforce, and thus discriminate against the indigent's need for peaceful and just settlement of all disputes is to adopt a narrow and grudging interpretion of the State's duty to maintain order. Giving the *Boddie* doctrine the broadest reading so that it would apply the exclusive means test to cases of "[a]nnulment, divorce actions, child custody proceedings, change-in-name suits, actions to clear title, settlement of decedent's estates, naturalization, and adjudication of incompetency" (Comment, *The Right of Access to Civil Courts by Indigents: A Prognosis*, 24 Am. U. L. Rev. 154 n.145 (1974)), there would still be excluded the principal kinds of claims of probable merit with which indigents may be concerned, namely, claims involving landlord and ten-

if permanent deprivation may follow; *In re Luscier*, 84 Wn.2d 135, 524 P.2d 906 (1974) (indigent parents right to counsel at public expense in parental deprivation proceedings); *Honore v. State Bd. of Prison Terms & Paroles*, 77 Wn.2d 660, 466 P.2d 485 (1970) (habeas corpus by indigent state prisoner).

ant, welfare eligibility, continuance and termination, consumer credit, family law, negligence, or other tort claims. See excerpts from *"The Survey of Legal Needs."* 12 Trial (June 1976). Moreover, only an appellate court can determine an appeal.

It is no answer to say, as does the majority, that indigent's claims have at times proved to be without merit. That is no reason for refusing to enable an indigent to pursue a claim of probable merit. Whether a claim of probable merit will be successful cannot always be known. If, however, a forum is provided to determine a claim which has probable substance, the State is better able to discharge its duty to maintain a peaceable order with justice under law.

Even the rule permitting the exercise of discretionary power to allow the expenditure of public funds to enable an indigent to prosecute an appeal of probable merit does not require a showing of probable success. Moreover, such a showing cannot be assured without first having a trial. *See Carter v. University of Washington*, 87 Wn.2d 483, 554 P.2d 338 (1976).

The majority argues the only provision in the constitution on which this court can rely to protect the poor in dealing with the right of court access is Const. art. 1, § 17, which forbids imprisonment for debt except as to absconding debtors. In passing, the argument overlooks Const. art. 8, § 7, expressive of concern for the "necessary support of the poor and infirm." The argument overlooks the fact that the same constitution also contains the due process and equal protection clauses and a clause protecting the right to petition for redress of grievances (Const. art. 1, §§ 3, 4, and 12). If the majority's arguments were accepted, even the right of access to the courts to the extent defined in *Boddie* for the benefit of indigents pursuing a claim of fundamental interest would have been impossible because policy legislation had not first been enacted to make the *Boddie* rule possible.

The majority then seeks to distinguish the constitutional

right of appeal in criminal cases from the constitutional right of appeal in civil cases. It argues express provision exists for the right of appeal in criminal cases in article 1, section 22, amendment 10, of the state constitution but no such right is embodied for civil cases. Again, the argument ignores the constitutional due process and equal protection clauses and the right to petition for redress of grievances.

Under the equal protection clause of the Fourteenth Amendment, if a state provides a right to appeal by a defendant in a criminal case who can afford to pay, as distinguished from a discretionary appeal such as a petition for review from the Court of Appeals to the Supreme Court, then, whether or not there is a constitutional obligation to provide such a right of appeal, equal protection requires that a right of appeal similar to that accorded the defendant who can afford to pay, be accorded the indigent who cannot afford to pay, and such right of appeal must be funded with public funds. *See Douglas v. California*, 372 U.S. 353, 9 L. Ed. 2d 811, 83 S. Ct. 814 (1963); *Ross v. Moffitt*, 417 U.S. 600, 41 L. Ed. 2d 341, 94 S. Ct. 2437 (1974).

These cases, it is true, involve appeals by indigent defendants in criminal cases. This rationale also should be available in a civil case. The fact that the state may not have to provide a right of appeal even under the Fourteenth Amendment or under our own state constitution does not mean that if the state notwithstanding provides such a right, it may, in effect, allow the appeal only in the case of those who can afford to pay.

Moreover, the majority's argument overlooks the fact our legislature itself has lent its approval to the constitutional right of court appeal by making provisions for its funding and did so promptly upon the decision of *Carter 1*. RCW 4.88.330, RAP 15.2 (c). *See also* RCW 74.08.080.

The majority argues the right to petition for grievances contained in our constitution (Const. art. 1, § 4) is limited to petitioning for settlement of political grievances. Our constitution does not say so and *Carter 1* called attention to much legal writing supporting a contrary position. We

must construe article 1, section 4, so as to give full effect to its broad language and purpose to the end that both the poor and the affluent may be heard by government. Since the judiciary is a branch of government it makes good sense to recognize that the right to petition for relief against grievances involves the right to petition the courts for relief within the jurisdiction of the courts to give.

It should be noted in passing that *Carter 1* does not rely upon article 1, section 4 as the sole constitutional provision dealing with the subject under consideration. *Carter 1*'s principal reliance was on article 1, section 12, a section alone sufficient to support the recognition of the right of court access. *Carter 1* might also have relied in part upon due process (Const. art. 1, § 3), just as *Boddie* relied upon the due process clause contained in the Fourteenth Amendment in upholding the right of court access for indigents in cases involving a fundamental interest when the state has a monopoly of means to enforce that right. *See generally* Comment, *The Right of Access to Civil Courts by Indigents: A Prognosis*, 24 Am. U. L. Rev. 129-58 (1974).

Finally, the majority argues we should import the restrictive interpretations of the right of court access made in *Boddie*, *Kras*, and *Schwab* in construing the Fourteenth Amendment when we come to construe our own article 1, section 12 of the state constitution. I cannot agree and make the following observations without unnecessary repetition of the arguments relied on in *Carter 1*.

First, this court, in construing our own state constitution, may, but is not required to follow the federal interpretations of corresponding provisions of the federal constitution. A state does not lack power to protect its people in a manner more protective of their rights under its state constitution than is permitted by the federal cases cited in construing the Fourteenth Amendment. The Supreme Court of the United States has recognized that it has no right to review a state court's interpretation of its own constitution. *Murdock v. Memphis*, 87 U.S. (20 Wall.) 590, 22 L. Ed. 429 (1875). State courts have interpreted their

own constitutions differently in a manner more protective of individual's rights than the interpretations of the Supreme Court of the United States of corresponding provisions of the federal constitution. *People v. Disbrow*, 16 Cal. 3d 101, 545 P.2d 272, 127 Cal. Rptr. 360 (1976); *State v. Johnson*, 68 N.J. 349, 346 A.2d 66 (1975); *Southern Burlington County NAACP v. Mount Laurel*, 67 N.J. 151, 336 A.2d 713 (1975); *Darrin v. Gould*, 85 Wn.2d 859, 540 P.2d 882 (1975); Burger, *What the Justices Are Saying* . . . 62 ABA Journal 992, 993-94 (Aug. 1976). *See also* V. Countryman, *The Role of a Bill of Rights in a Modern State Constitution*, 45 Wash. L. Rev. 453, 456-66 (1970); M. Roman, *Commonwealth v. Richman: A State's Extension of Procedural Rights Beyond Supreme Court Requirements*, 13 Duquesne L. Rev. 577 (1974-75).

Second, to adopt the *Boddie, Kras,* and *Schwab* interpretations of the Fourteenth Amendment will subject the people of this state to the same criticisms that have been directed against these federal decisions. These criticisms are referred to in *Carter 1*, footnote 3, at page 397. The failure of *Boddie, Kras,* and *Schwab* to give adequate subject matter relief to the indigent, has resulted in the use of the phrase "justice at a price." L. Davis, *United States v. Kras: Justice At A Price*, 40 Brooklyn L. Rev. 147 (Pt. 1, 1973-74).

Third, the rationale of *Boddie, Kras,* and *Schwab* provides for a limited right of access to the courts by indigents in civil cases to cases involving a claim of a fundamental interest or right in which the court has a monopoly of means to enforce that right excluding claims involving economics or social welfare. These exclusions take from the indigent the opportunity to settle most of the claims the indigents have. If the arguments of the majority are accepted, including the right to appeal a judgment seemingly erroneous, we cannot have a just order by excluding a substantial segment of our population—the indigent—from effective access to the courts in a civil case to prosecute or appeal a claim of probable merit. The very fact an indigent

has no bargaining power because he lacks economic resources shows that any peaceful alternative to court settlement is not practical. This is especially true when alternatives to peaceful settlement involve obtaining consent, the adverse party may refuse, *e.g.*, arbitration. There is no adequate substitute for court settlement. Courts alone have the power other organizations lack and cannot obtain except by themselves resorting to the courts for the enforcements of their decisions.

It is true, the majority opinion reaffirms *O'Connor v. Matzdorff*, 76 Wn.2d 589, 458 P.2d 154 (1969), involving an indigent's claim of replevin. The court there recognized the power of the court to waive court filing fees imposed by statute or court rule. The majority opinion here, however, reserves the question of whether the court has inherent power to waive the court reporter's fee and the statutory cost bond as waived in *Iverson v. Marine Bancorporation*, 83 Wn.2d 163, 517 P.2d 197 (1973). Obviously, waiving the statutory or court rule filing fee is hardly adequate to enable an indigent to appeal an adverse determination of a good faith claim of a civil nature of probable merit. There is the cost of the transcript, statement of facts, briefs, attorney's fees, and miscellaneous expenses which must be incurred in the successful prosecution of an appeal.

To recognize a discretionary right to waive filing fees for an indigent in a civil case of probable merit urged in good faith (even though with no limitation of subject matter) without making provision for more than waiver of the filing fee is, in effect, to deny any effective access to the courts by a substantial segment of our population. See footnote 6.

It was long ago pointed out by Chief Justice Charles Evans Hughes of the United States Supreme Court:

> *The Supreme Court of the United States and the Court of Appeals will take care of themselves. Look after the courts of the poor, who stand most in need of justice. The security of the republic will be found in the treatment of*

*the poor and ignorant; in indifference to their misery and helplessness lies disaster.*

R. Arnold, *Will citizens change the judicial process?*, 60 Judicature 69 (1976).

In sum, (1) it is the duty of the State to maintain order in a spirit of justice under law for the benefit of all subject to the State's jurisdiction, and (2) it is unnecessary and undesirable to exclude an indigent from access to the courts (including an appeal in civil cases to prosecute a good faith claim of probable merit) especially when legislation and court rules provide for the use of public funds when there is a constitutional right of appeal, and (3) to adopt the *Boddie, Kras,* and *Schwab* rationale in construing our own constitution is to import into our state law the serious shortcomings of that rationale. We take a backward step in overruling *Carter 1* in the manner attempted. It is enough in this case to simply deny the motion for public funds because of failure to demonstrate petitioner's claim has probable merit.

I therefore concur in the result reached by the majority but not in the majority's rationale.

UTTER, J., concurs with HOROWITZ, J.

Petition for rehearing denied January 11, 1977.